MICHAEL J. GARCIA
United States Attorney for the
Southern District of New York
By:  PIERRE G. ARMAND
Assistant United States Attorney
86 Chambers Street, 3rd Floor
New York, New York 10007
Telephone: (212) 637-2804
E-mail:  pierre.armand@usdoj.gov

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA               :
                                       :
               Plaintiff,              :        No. 08 Civ. 7378 (SCR)
                                       :
        v.                             :
                                       :        **NOTICE OF LODGING OF**
                                       :        **PROPOSED CONSENT DECREE**
CITY OF NEWBURGH, CITY OF              :
POUGHKEEPSIE, CONNELL LIMITED          :
PARTNERSHIP,  INTERNATIONAL            :
BUSINESS MACHINES CORP., NORTHROP      :
GRUMMAN SHIP SYSTEMS, INC.,            :
                                       :
               Defendants.             :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

        The United States of America is hereby lodging with the Court the proposed

Consent Decree ("Consent Decree") attached hereto as Exhibit A.

        The United States requests that the Court not enter the Consent Decree at this

time.  Rather, pursuant to 28 C.F.R. § 50.7, notice of the lodging of the Consent Decree will be

published in the Federal Register, following which the United States Department of Justice will

receive public comments on the Consent Decree for a 30-day period.  After the conclusion of the

comment period, the United States will file with the Court any comments received, as well as

responses to the comments, and at that time, if appropriate, will request the Court to approve and

enter the Consent Decree.

Dated: New York, New York
       August 21, 2008


                              MICHAEL J. GARCIA
                              United States Attorney for the
                              Southern District of New York
                              Attorney for the United States of America

                       By:      /s/    Pierre G. Armand
                              PIERRE G. ARMAND
                              Assistant U.S. Attorneys
                              86 Chambers Street, 3rd Floor
                              New York, New York  10007
                              Tel. No.: (212) 637-2724
                              Fax No.:  (212) 637-2730

To:    By Federal Express

       Geoffrey Chanin
       Corporation Counsel
       City of Newburgh
       City Hall
       83 Broadway
       Newburgh, NY 12550

       Michael Zarin, Esq.
       Helen Mauch, Esq.
       Zarin & Steinmetz
       81 Main Street, Suite 415
       White Plains, NY 10601
       *Attorneys for the City of Newburgh*

       Kimberlea Shaw Rea, Esq.
       Bosworth Gray & Fuller
       116 Kraft Avenue
       Bronxville, New York  10708
       *Attorneys for the City of Poughkeepsie*

       Mr. John V. Curtin
       Vice President, Legal and Environmental
       Connell Industries, L.P.
       1 International Plaza
       Boston, MA 02110-2602

Patrick van der Voorn, Esq.
Wilmer Hale
60 State Street
Boston, MA 02109
*Attorneys for Connell Limited Partnership*

Hiroko Muraki Gottleib, Esq.
IBM Corporation
294 Route 100
Mail Drop 2395
Somers, NY 10589

Mary Beth Deemer, Esq.
Jones Day
One Mellon Center
500 Grant Street, Suite 3100
Pittsburgh, PA 15219-2502
*Attorneys for International Business Machines Corp.*

Robert J. Ariatti, Jr.
Northrop Grumman Ship Systems, Inc.
Ingalls Operations
1000 Access Road
Pascagoula, MS 39568

Aaron Gershonowitz, Esq.
Forchelli, Curto, Schwartz, et al.
330 Old Country road
Mineola, NY 11501
*Attorneys for Northrop Grumman Ship Systems, Inc.*

CERTIFICATE OF SERVICE

        I, PIERRE G. ARMAND, an Assistant United States Attorney for the Southern District of New York, hereby certify that on August 21, 2008, I caused a copy of the foregoing Notice of Lodging of Proposed Consent Decree to be served upon the following counsel of record for defendants by Federal Express:

        Geoffrey Chanin
        Corporation Counsel
        City of Newburgh
        City Hall
        83 Broadway
        Newburgh, NY 12550

        Michael Zarin, Esq.
        Helen Mauch, Esq.
        Zarin & Steinmetz
        81 Main Street, Suite 415
        White Plains, NY 10601
        *Attorneys for the City of Newburgh*

        Kimberlea Shaw Rea, Esq.
        Bosworth Gray & Fuller
        116 Kraft Avenue
        Bronxville, New York  10708
        *Attorneys for the City of Poughkeepsie*

        Mr. John V. Curtin
        Vice President, Legal and Environmental
        Connell Industries, L.P.
        1 International Plaza
        Boston, MA 02110-2602

        Patrick van der Voorn, Esq.
        Wilmer Hale
        60 State Street
        Boston, MA 02109
        *Attorneys for Connell Limited Partnership*

        Hiroko Muraki Gottleib, Esq.
        IBM Corporation
        294 Route 100
        Mail Drop 2395
        Somers, NY 10589

Mary Beth Deemer, Esq.
Jones Day
One Mellon Center
500 Grant Street, Suite 3100
Pittsburgh, PA 15219-2502
*Attorneys for International Business Machines Corp.*

Robert J. Ariatti, Jr.
Northrop Grumman Ship Systems, Inc.
Ingalls Operations
1000 Access Road
Pascagoula, MS 39568

Aaron Gershonowitz, Esq.
Forchelli, Curto, Schwartz, et al.
330 Old Country road
Mineola, NY 11501
*Attorneys for Northrop Grumman Ship Systems, Inc.*


Dated:        New York, New York
              August 21, 2008

                                    ___/s/___Pierre G. Armand_____
                                    PIERRE G. ARMAND

-2-

# EXHIBIT A

**(Part 1 of 3)**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA<br>Plaintiff,<br><br>v.<br><br>CITY OF NEWBURGH, CITY OF POUGHKEEPSIE, CONNELL LIMITED PARTNERSHIP, INTERNATIONAL BUSINESS MACHINES CORP., NORTHROP GRUMMAN SHIP SYSTEMS, INC.,<br><br>Defendants. | CIVIL ACTION NO.  08 Civ. 7378 (SCR) |

## CONSENT DECREE

2

# TABLE OF CONTENTS

I.      BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
II.     JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3
III.    PARTIES BOUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3
IV.     DEFINITIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
V.      STATEMENT OF PURPOSE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
VI.     PAYMENT OF RESPONSE COSTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
VII.    FAILURE TO COMPLY WITH CONSENT DECREE . . . . . . . . . . . . . . . . . .7
VIII.   COVENANT NOT TO SUE BY PLAINTIFF . . . . . . . . . . . . . . . . . .9
IX.     RESERVATION OF RIGHTS BY PLAINTIFF. . . . . . . . . . . . . . . . . . . . . 10
X.      COVENANT   NOT   TO   SUE   BY   SETTLING
        DEFENDANTS   AND   OTHER   SETTLING   PARTIES. . . . . . . . . . 11
XI.     EFFECT  OF  SETTLEMENT/CONTRIBUTION  PROTECTION . . . . 12
XII.    ACCESS, INSTITUTIONAL CONTROLS AND SMP. . . . . . . . . . . . . . . . . . . 14
XIII    APPROVAL  OF  SMP  AND  EASEMENT/COVENANT. . . . . . . . . .18
XIV.    SALE OF SITE PROPERTY BY OWNER SETTLING DEFENDANT . . . . . . 21
XV.     FUTURE  COST  RECOVERY. . . . . . . . . . . . . . . . . . 22
XVI.    RETENTION OF RECORDS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .23
XVII.   NOTICES  AND  SUBMISSIONS  . . . . . . . . . . . . . . . . . . . . . . . . 24
XVIII.  RETENTION  OF  JURISDICTION  . . . . . . . . . . . . . . . . 26
XIX.    INTEGRATION/APPENDICES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
XX.     MODIFICATIONS TO THIS CONSENT DECREE. . . . . . . . . . . . . . . . .26
XXI.    LODGING AND OPPORTUNITY FOR PUBLIC COMMENT. . . . . . . . . . . . . .26
XXII.   SIGNATORIES/SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
XXIII.  FINAL JUDGMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . .. 27

3

# I. **BACKGROUND**

A.  The United States of America, on behalf of the Administrator of the United States Environmental Protection Agency ("EPA"), filed a complaint in this matter pursuant to Sections 106 and 107 of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended ("CERCLA"), 42 U.S.C. §§ 9606 and 9607, seeking injunctive relief and reimbursement of response costs incurred or to be incurred for response actions taken or to be taken at or in connection with the release or threat of release of hazardous substances at the Consolidated Iron and Metal Superfund Site, in the City of Newburgh, Orange County, New York (the "Site").

B.  The Settling Defendants and Other Settling Parties that have entered into this Consent Decree do not admit any liability to Plaintiff arising out of the transactions or occurrences alleged in the complaint.

C.  The Plaintiff, Settling Defendants, and Other Settling Parties agree, and this Court by entering this Consent Decree finds, that this Consent Decree has been negotiated by the Parties in good faith, that settlement of this matter will avoid prolonged and complicated litigation between the Parties, and that this Consent Decree is fair, reasonable, and in the public interest.

THEREFORE, with the consent of the Parties to this Decree, it is ORDERED, ADJUDGED, AND DECREED:

# II. **JURISDICTION**

1.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1345 and 1367, and 42 U.S.C. §§ 9606, 9607 and 9613(b), and also has personal jurisdiction over Settling Defendants and Other Settling Parties.  Solely for the purposes of this Consent Decree and the underlying complaint, Settling Defendants and Other Settling Parties waive all objections and defenses that they may have to jurisdiction of the Court or to venue in this District.  Settling Defendants and Other Settling Parties shall not challenge the terms of this Consent Decree or this Court's jurisdiction to enter and enforce this Consent Decree.

# III. **PARTIES BOUND**

2.  This Consent Decree is binding upon the Plaintiff and upon Settling Defendants and Other Settling Parties and their heirs, successors and assigns.  Any change in ownership or corporate or other legal status, including but not limited to, any transfer of assets or real or personal property, shall in no way alter the status or responsibilities of Settling Defendants and Other Settling Parties under this Consent Decree.

4

## IV. DEFINITIONS

3. Unless otherwise expressly provided herein, terms used in this Consent Decree that are defined in CERCLA or in regulations promulgated under CERCLA shall have the meanings assigned to them in CERCLA or in such regulations. Whenever terms listed below are used in this Consent Decree or in any appendix attached hereto, the following definitions shall apply:

a. "CERCLA" shall mean the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. §§ 9601-9675.

b. "Consent Decree" shall mean this Consent Decree and any appendices attached hereto. In the event of conflict between this Consent Decree and any appendix, the Consent Decree shall control.

c. "Day" shall mean a calendar day. In computing any period of time under this Consent Decree, where the last day would fall on a Saturday, Sunday, or federal holiday, the period shall run until the close of business of the next working day.

d. "Development Agreement" shall mean the Development Agreement by and between the City of Newburgh and Leyland Alliance, LLC dated June 20, 2007, as executed, and attached hereto as Appendix C.

e. "DOJ" shall mean the United States Department of Justice and any successor departments, agencies or instrumentalities of the United States.

f. "EPA" shall mean the United States Environmental Protection Agency and any successor departments, agencies or instrumentalities of the United States.

g. "EPA Hazardous Substance Superfund" shall mean the Hazardous Substance Superfund established by the Internal Revenue Code, 26 U.S.C. § 9507.

h. "Fair Market Value" shall mean the price at which the Site Property would change hands between a willing buyer and a willing seller under actual market conditions, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts.

i. "Interest" shall mean interest at the rate specified for interest on investments of the EPA Hazardous Substance Superfund established by 26 U.S.C. § 9507, compounded annually on October 1 of each year, in accordance with 42 U.S.C. § 9607(a). The applicable rate of interest shall be the rate in effect at the time the interest accrues. The rate of interest is subject to change on October 1 of each year.

5

j. "NYSDEC" shall mean the New York State Department of Environmental Conservation.

k. "Owner Settling Defendant" shall mean the City of Newburgh.

l. "Other Settling Parties" shall mean those parties, other than Settling Defendants, participating in payment of Response Costs to EPA and listed in Appendix A.

m. "Paragraph" shall mean a portion of this Consent Decree identified by an Arabic numeral or an upper or lower case letter.

n. "Parties" shall mean the United States of America, the Settling Defendants, and Other Settling Parties.

o. "Person" shall mean an individual, firm, corporation, association, partnership, consortium, joint venture, commercial entity, United States Government, State, municipality, commission, political subdivision of a State, or any interstate body.

p. "Plaintiff" shall mean the United States acting on behalf of EPA

q. "Record of Decision" or "ROD" shall mean the EPA Record of Decision containing the cleanup plan for the Consolidated Iron and Metal Superfund Site, signed on October 4, 2006, by the Regional Administrator, EPA Region 2, or his/her delegate, and all attachments thereto.

r. "Remedial Action" shall mean those activities, except for Operation and Maintenance, to be undertaken by EPA and Owner Settling Defendant to implement the Record of Decision.

s. " Response Costs" shall mean all costs, including but not limited to direct and indirect costs, that EPA and DOJ on behalf of EPA have paid or will pay at or in connection with the Site, plus accrued Interest on all such costs.

t. "Section" shall mean a portion of this Consent Decree identified by a Roman numeral.

u. "Settling Defendants" shall mean the City of Newburgh, the City of Poughkeepsie, Connell Limited Partnership, International Business Machines Corporation, and Northrop Grumman Ship Systems, Inc.

v. "Site" shall mean the Consolidated Iron and Metal Superfund Site, encompassing approximately 7 acres, located at the foot of Washington Street in the City of Newburgh, Orange County, New York, and all areas to which contamination resulting from the

6

operations at the Site Property has migrated.  The Site is depicted generally on the map attached as Appendix B.

w.  "Site Management Plan" or "SMP" shall mean a plan which will be prepared by Owner Settling Defendant and reviewed and approved by EPA as part of the remedy at the Site that provides for the proper management of all Site remedy components after completion of the Remedial Action.

x.  "Site Property" shall mean the property which comprises the former Consolidated Iron and Metal Co., Inc. facility, encompassing approximately 7 acres, located at the foot of Washington Street in the City of Newburgh, Orange County, New York and described on the Orange County Land and Tax Map as Section 40, Block 3, Lot 3.

y.  "State" shall mean the State of New York.

z.  "Transfer" shall mean sale, assignment, transfer or exchange by Owner Settling Defendant of the Site Property, where title to the Site Property is transferred, and Fair Market Value is received in consideration.

aa.  "United States" shall mean the United States of America, including its departments, agencies and instrumentalities.

## V.  **STATEMENT OF PURPOSE**

4.  By entering into this Consent Decree, the mutual objective of the Parties is for Settling Defendants and Other Settling Parties to make a cash payment to address their liability for the Site as provided in the Covenant Not to Sue by Plaintiff in Section VIII, and subject to the Reservations of Rights by United States in Section IX.

## VI.  **PAYMENT OF RESPONSE COSTS**

5. Payment of Response Costs by Settling Defendants and Other Settling Parties.

a.  Within 10 days of the entry of this Consent Decree by the court or by July 30, 2008, whichever date is later, Settling Defendants and Other Settling Parties shall pay to EPA $9,862,000.

b.  On September 30, 2009, Settling Defendants shall pay to EPA $300,000, $112,256.28 of which shall constitute interest on the unpaid balance.

c.  On January 4, 2010, Settling Defendants shall pay to EPA $1,900,000, $22,969.44 of which shall constitute interest on the unpaid balance.

7

6. Payments shall be made by FedWire Electronic Funds Transfer (EFT) to the United States Department of Justice account in accordance with current EFT procedures, referencing the USAO File Number 2002V2080, EPA - Region 2, Site Spill ID Number 02-LT, and DOJ Case Number 90-11-3-07979. Payment shall be made in accordance with instructions provided to Settling Defendants by the Financial Litigation Unit of the United States Attorney's Office in the Southern District of New York following lodging of the Decree. Any payment received by the Department of Justice after 4:00 p.m. Eastern Time shall be credited on the next business day.

7. Notice that such payments have been made shall be sent to EPA and DOJ in accordance with Section XVII (Notices and Submissions), and to:

> U.S. EPA
> 26 W. Martin Luther King Drive
> Attention: FINANCE
> MS: NWD
> Cincinnati, Ohio 45268
>
> With E-mails to: *AcctsReceivable.CINWD@epa.gov.*

Such notice shall reference EPA Region 2, the Site/Spill Identification Number 02-LT, the DOJ Case Number 90-11-3-07979, and the civil action number.

8. The total amount to be paid by Settling Defendants to the United States pursuant to Paragraph 5, $12,062,000, shall be deposited into the Consolidated Iron and Metal Superfund Site Special Account within the EPA Hazardous Substance Superfund to be retained and used to conduct or finance response actions at or in connection with the Site, or to be transferred by EPA to the EPA Hazardous Substance Superfund.

## VII. **FAILURE TO COMPLY WITH CONSENT DECREE**

9. Interest on Late Payments. If Settling Defendants fail to make any payment under Section VI (Payment of Response Costs) by the required due date, Interest shall continue to accrue on the unpaid balance through the date of payment.

10. Stipulated Penalty.

a. If any amounts due EPA by Settling Defendants under Section VI (Payment of Response Costs) are not paid by the required date, Settling Defendants shall be in violation of this Consent Decree and shall pay to EPA, as a stipulated penalty, in addition to the Interest required by Paragraph 9, the following penalty per violation per day that such payment is late:

8

| Penalty Per violation Per day | Period of Noncompliance |
|---|---|
| $2,500 | 1st-14th Day |
| $5,000 | 15th-30th Day |
| $10,000 | 31st Day and beyond |

b.  If Owner Settling Defendant fails to timely submit, or if necessary, revise and resubmit, any plan, report or other deliverable, including but not limited to, the SMP and the easement/covenant, or fails to properly and timely implement a provision of the SMP, Owner Settling Defendant shall be in violation of this Consent Decree and shall pay to EPA as a stipulated penalty the following amounts per violation per day that such deliverable is late:

| Penalty Per violation Per day | Period of Noncompliance |
|---|---|
| $1,000 | 1st-14th Day |
| $2,000 | 15th-30th Day |
| $4,000 | 31st Day and beyond |

c.  Stipulated penalties are due and payable within 30 days of the date of the demand for payment of the penalties by EPA.  All payments to EPA under this Paragraph shall be identified as "stipulated penalties" and shall be made by certified or cashier's check payable to "EPA Hazardous Substance Superfund."  The check, or a letter accompanying the check, shall identify the name and address of the party(ies) making payment, the Consolidated Iron and Metal Superfund Site, EPA Region 2, the Site/Spill Identification Number 02-LT, the DOJ Case Number 90-11-3-07979, and the civil action number, and shall be sent to:

U.S. Environmental Protection Agency
Fines and Penalties
Cincinnati Finance Center
P.O. Box 979077
St. Louis, MO 63197-9000

d.  On the day of each payment under Subparagraph b, above, Settling Defendants shall also send notice that payment has been made to EPA and DOJ in accordance with Section XVII (Notices and Submissions), and to:

U.S. EPA
26 W. Martin Luther King Drive
Attention:  FINANCE
MS: NWD
Cincinnati, Ohio 45268

With E-mails to: *AcctsReceivable.CINWD@epa.gov.*

9

Such notice shall reference the Consolidated Iron and Metal Superfund Site, EPA Region 2, the Site/Spill Identification Number 02-LT, EPA Enforcement Action number 02-2006-0015, DOJ Case Number 90-11-3-07979, and the civil action number.

          e. Penalties shall accrue as provided in this Paragraph regardless of whether EPA has notified Settling Defendants of the violation or made a demand for payment, but need only be paid upon demand. All penalties shall begin to accrue on the day after payment is due and shall continue to accrue through the date of payment. Nothing herein shall prevent the simultaneous accrual of separate penalties for separate violations of this Decree.

    11. If the United States brings an action to enforce this Consent Decree, Settling Defendants shall reimburse the United States for all costs of such action, including but not limited to costs of attorney time, provided, however, if such enforcement action relates only to the obligations of Owner Settling Defendant, then Owner Settling Defendant shall be liable solely for reimbursing the United States as provided in this Paragraph.

    12. Payments made under this Section shall be in addition to any other remedies or sanctions available to the United States by virtue of Settling Defendants' failure to comply with the requirements of this Consent Decree.

    13. The obligations of Settling Defendants to pay the amounts pursuant to Paragraph 5 to the United States under this Consent Decree are joint and several. In the event of the failure of any one or more Settling Defendants to make the payments required under this Consent Decree, the remaining Settling Defendants shall be responsible for the entire payment(s) required by Paragraph 5.

    14. Notwithstanding any other provision of this Section, the United States may, in its unreviewable discretion, waive payment of any portion of the stipulated penalties that have accrued pursuant to this Consent Decree. Payment of stipulated penalties shall not excuse Settling Defendants from payment as required by Section VI or from performance of any other requirements of this Consent Decree.

## VIII.  COVENANT NOT TO SUE BY PLAINTIFF

    15. <u>Covenant Not to Sue by United States</u>. Except as specifically provided in Section IX (Reservations of Rights by Plaintiff), the United States covenants not to sue or to take administrative action against Settling Defendants and Other Settling Parties pursuant to Sections 106 and 107(a) of CERCLA, 42 U.S.C. §§ 9606 and 9607(a), with regard to the Site. With respect to present liability, this covenant not to sue shall take effect upon the receipt by EPA of all payments by Settling Defendants and Other Settling Parties required by Section VI, and any amount due under Section VII (Failure to Comply with Consent Decree). With respect to future liability, this covenant not to sue shall take effect upon Certification of Completion of the Remedial Action as provided in Paragraph 20, below. This covenant not to sue is conditioned upon the satisfactory performance by Settling Defendants and Other Settling Parties of their

10

obligations under this Consent Decree. This covenant not to sue extends only to the Settling Defendants and Other Settling Parties and does not extend to any other person.

## IX.  RESERVATION OF RIGHTS BY PLAINTIFF

16.  The United States reserves, and this Consent Decree is without prejudice to, all rights against Settling Defendants and Other Settling Parties with respect to all matters not expressly included within the Covenant Not to Sue by Plaintiff in Section VIII. Notwithstanding any other provision of this Consent Decree, the United States reserves all rights against Settling Defendants with respect to subparagraphs a. through e. below and Other Settling Parties with respect to subparagraphs b. through e. below, as follows:

a.  liability for failure of Settling Defendants to meet a requirement of this Consent Decree;

b.  criminal liability;

c.  liability for damages for injury to, destruction of, or loss of natural resources, and for the costs of any natural resource damage assessments;

d.  liability of Settling Defendants and Other Settling Parties, based upon their ownership or operation of the Site or their transportation, treatment, storage, or disposal, or arrangement for the transportation, treatment, storage, or disposal, of a hazardous substance, pollutant, contaminant or solid waste at or in connection with the Site, after signature of this Consent Decree; and

e.  liability arising from the past, present, or future disposal, discharge, release or threat of release of a hazardous substance, pollutant, contaminant or solid waste outside the Site.

17.  United States Pre-Certification Reservations.  Notwithstanding any other provision of this Consent Decree, the United States reserves, and this Consent Decree is without prejudice to, the right to institute proceedings in this action or in a new action, or to issue an administrative order seeking to compel Settling Defendants either to perform further response actions relating to the Site or to reimburse the United States for additional costs of response if, (a) prior to Certification of Completion of the Remedial Action, (i) conditions at the Site, previously unknown to EPA, are discovered, or (ii) information, previously unknown to EPA, is received, in whole or in part, and (b) EPA determines that these previously unknown conditions or information together with any other relevant information indicates that the Remedial Action is not protective of human health or the environment.

18.  United States Post-Certification Reservations.  Notwithstanding any other provision of this Consent Decree, the United States reserves, and this Consent Decree is without prejudice to, the right to institute proceedings in this action or in a new action, or to issue an administrative order seeking to compel Settling Defendants either to perform further response actions relating to

11

the Site or to reimburse the United States for additional costs of response if, (a) subsequent to Certification of Completion of the Remedial Action, (i) conditions at the Site, previously unknown to EPA, are discovered, or (ii) information, previously unknown to EPA, is received, in whole or in part, and (b) EPA determines that these previously unknown conditions or this information together with other relevant information indicate that the Remedial Action is not protective of human health or the environment.

19.  For purposes of Paragraph 17, the information and the conditions known to EPA shall include only that information and those conditions known to EPA as of the date the Record of Decision for the Remedial Action was signed and set forth in the Record of Decision and the administrative record supporting the Record of Decision.  For purposes of Paragraph 18, the information and the conditions known to EPA shall include only that information and those conditions known to EPA as of the date of Certification of Completion of the Remedial Action and set forth in the Record of Decision, the administrative record supporting the Record of Decision, the post-Record of Decision administrative record, or in any information received by EPA pursuant to the requirements of this Consent Decree prior to Certification of Completion of the Remedial Action.

20.  Certification of Completion of the Remedial Action.  As soon as reasonably practicable after EPA completes the Remedial Action for the Site, EPA will certify in writing that the Remedial Action has been performed fully and that the performance standards have been attained.  This certification shall constitute the Certification of Completion of the Remedial Action for purposes of Paragraphs 15, 17, 18 and 19 above.  Upon request of Settling Defendants, EPA will provide periodic updates on the progress of the Remedial Action to the Settling Defendants.

21.  Nothing in this Consent Decree is intended to be nor shall it be construed as a release, covenant not to sue, or compromise of any claim or cause of action, administrative or judicial, civil or criminal, past or future, in law or in equity, which the United States may have against any person, firm, corporation or other entity not a signatory to this Consent Decree.

## X.  COVENANT NOT TO SUE BY SETTLING DEFENDANTS AND OTHER SETTLING PARTIES

22.  Settling Defendants and Other Settling Parties covenant not to sue and agree not to assert any claims or causes of action against the United States or their contractors or employees, with respect to the Site, including but not limited to:

a.  any direct or indirect claim for reimbursement from or against the Hazardous Substance Superfund, based on Sections 106(b)(2), 107, 111, 112, or 113 of CERCLA, 42 U.S.C. §§ 9606(b)(2), 9607, 9611, 9612, or 9613, or any other provision of law;

b.  any claim against the United States arising out of response actions at or in

12

connection with the Site, including any claim under the United States Constitution, the Tucker Act, 28 U.S.C. § 1491, the Equal Access to Justice Act, 28 U.S.C. § 2412, as amended, or at common law; or

       c. any claim against the United States pursuant to Sections 107 and 113 of CERCLA, 42 U.S.C. §§ 9607 and 9613, relating to the Site.

    23. Nothing in this Consent Decree shall be deemed to constitute approval or preauthorization of a claim within the meaning of Section 111 of CERCLA, 42 U.S.C. § 9611, or 40 C.F.R. 300.700(d).

    24. Settling Defendants and Other Settling Parties agree not to assert any claims and to waive all claims or causes of action that they may have for all matters relating to the Site, including but not limited to, claims or causes of action under Sections 107(a)(4)(b) and 113(f) of CERCLA, against any person where the person's liability to Settling Defendants and Other Settling Parties with respect to the Site is based solely on having arranged for disposal or treatment, or for transport for disposal or treatment, of hazardous substances at the Site, or having accepted for transport for disposal or treatment of hazardous substances at the Site, if:

    a. materials containing hazardous substances contributed by such person to the Site did not exceed 5,000 pounds.

    b. This waiver shall not apply to any claim or cause of action against any person meeting the above criteria if EPA has determined that the materials contributed to the Site by such person contributed or could contribute significantly to the costs of response at the Site. This waiver also shall not apply with respect to any defense, claim, or cause of action that Settling Defendants and Other Settling Parties may have against any person if such person asserts a claim or cause of action relating to the Site against Settling Defendants and Other Settling Parties.

    25. Settling Defendants and Other Settling Parties agree not to assert any claims and to waive all claims or causes of action that they may have for all matters relating to the Site, including but not limited to, claims or causes of action under Sections 107(a)(4)(b) and 113(f) of CERCLA, against any person that has entered into a final CERCLA § 122(g) *de minimis* settlement or a final settlement based on limited ability to pay with EPA with respect to the Site, or the Town of Rhinebeck, *provided*, however, that the Town of Rhinebeck enters into a *de minimis* settlement within one year of the date of entry of this Consent Decree. This waiver shall not apply with respect to any defense, claim, or cause of action that Settling Defendants and Other Settling Parties may have against any person if such person asserts a claim or cause of action relating to the Site against Settling Defendants and Other Settling Parties.

## XI. <u>EFFECT OF SETTLEMENT/CONTRIBUTION PROTECTION</u>

    26. Except as provided in Paragraphs 24 and 25 above, nothing in this Consent Decree shall be construed to create any rights in, or grant any cause of action to, any person not a Party

13

to this Consent Decree. Except as provided in Paragraphs 24 and 25, the Parties expressly reserve any and all rights (including, but not limited to, any right to contribution), defenses, claims, demands, and causes of action that they may have with respect to any matter, transaction, or occurrence relating in any way to the Site against any person not a Party hereto.

27. The Parties agree, and by entering this Consent Decree this Court finds, that Settling Defendants and Other Settling Parties are entitled, as of the date of entry of this Consent Decree, to protection from contribution actions or claims as provided by Section 113(f)(2) of CERCLA, 42 U.S.C. § 9613(f)(2), for "matters addressed" in this Consent Decree. The "matters addressed" in this Consent Decree are: all response actions taken or to be taken; and all response costs incurred or to be incurred, at or in connection with the Site, by the United States, or any other person. The "matters addressed" in this Consent Decree do not include those natural resources damages, response costs, or response actions as to which the Plaintiff has reserved its rights under this Consent Decree (except for claims for failure to comply with this Consent Decree), in the event that the Plaintiff asserts rights against Settling Defendants or Other Settling Parties coming within the scope of such reservations.

28. Settling Defendants and Other Settling Parties agree that, with respect to any suit or claim for contribution brought by them for matters related to this Consent Decree, prior to entry of the Consent Decree, they will notify EPA and DOJ in writing within 60 days of the initiation of such suit or claim, except to the extent that such claim or suit was brought by Settling Defendants before lodging of this Consent Decree, in which case Settling Defendants shall provide notice to EPA and DOJ within 10 days of the lodging of this Consent Decree. After the entry of this Consent Decree, Settling Defendants and Other Settling Parties agree that, with respect to any suit or claim for contribution brought by them for matters related to this Consent Decree they will notify EPA and DOJ in writing no later than 60 days prior to the initiation of such suit or claim. Each Settling Defendant and Other Settling Party also agrees that, with respect to any suit or claim for contribution brought against it for matters related to this Consent Decree, it will notify EPA and DOJ in writing within 10 days of service of the complaint or claim upon it. In addition, each Settling Defendant or Other Settling Party shall notify EPA and DOJ within 10 days of service or receipt of any Motion for Summary Judgment, and within 10 days of receipt of any order from a court setting a case for trial, for matters related to this Consent Decree.

29. In any subsequent administrative or judicial proceeding initiated by the United States, or EPA for injunctive relief, recovery of response costs, or other relief relating to the Site, Settling Defendants or Other Settling Parties shall not assert, and may not maintain, any defense or claim based upon the principles of waiver, *res judicata*, collateral estoppel, issue preclusion, claim-splitting, or other defenses based upon any contention that the claims raised by the United States or EPA in the subsequent proceeding were or should have been brought in the instant case; *provided*, however, that nothing in this Paragraph affects the enforceability of the Covenant by Plaintiff set forth in Section VIII.

14

## XII. ACCESS, INSTITUTIONAL CONTROLS, AND SITE MANAGEMENT PLAN

30.    Owner Settling Defendant shall:

a.   commencing on the date of lodging of this Consent Decree, provide the United States, the State, and their representatives, including EPA and its contractors, with access at all reasonable times to the Site Property, or such other property it controls, for the purpose of conducting any activity related to this Consent Decree including, but not limited to, the following activities:

(1)    Performing and/or monitoring response actions at the Site;

(2)    Verifying any data or information submitted to the United States;

(3)    Conducting investigations relating to contamination at or near the Site;

(4)    Obtaining samples;

(5)    Assessing the need for, planning, or implementing additional response actions at or near the Site;

(6)    Assessing Owner Settling Defendant's compliance with this Consent Decree;

(7)    Determining whether the Site or other property is being used in a manner that is prohibited or restricted, or that may need to be prohibited or restricted, by or pursuant to this Consent Decree; and

(8)    Inspecting and copying records or other documents maintained or generated by Owner Settling Defendant or its agents, consistent with Paragraph 36 below;

b.   commencing on the date of lodging of this Consent Decree, refrain from using the Site Property, or such other property it controls, in any manner that would interfere with or adversely affect the implementation, integrity, or protectiveness of the remedial measures to be performed at the Site pursuant to this Consent Decree.  Such use restrictions include, but are not limited to:

i.      prohibition of any excavation six feet below the ground surface unless the excavation activities are in compliance with the Site Management Plan as provided in the ROD and are approved by EPA in writing in advance;

ii.     prohibition of any new construction at the Site unless an evaluation of the potential for vapor intrusion is conducted and mitigation, if necessary, is performed in compliance with the Site Management Plan as provided in the ROD, and is approved by EPA in writing in advance; and

iii.    prohibition of the use of groundwater at the Site as a source of potable or process water until groundwater quality standards are met at the Site; and

c.   upon EPA's request, execute and record in the Orange County Clerk's Office, State of New York, an easement/covenant, running with the land, that (i) grants a right of access for the purpose of conducting any activity related to the Site Property including, but not limited to, those

15

activities listed in Paragraph 30 a. of this Consent Decree, and (ii) grants the right to enforce the land/water use restrictions listed in Paragraph 30.b. of this Consent Decree, or other restrictions that EPA determines are necessary to implement, ensure non-interference with, or ensure the protectiveness of the remedial measures to be performed at the Site Property. Owner Settling Defendant shall grant the access rights and the rights to enforce the land/water use restrictions to one or more of the following persons: (i) the State and its representatives, (ii) the other Settling Defendants and their representatives, and/or (iii) other appropriate grantees, as determined by EPA. EPA will provide prior notice to Owner Settling Defendant of the identity of the grantee(s). Owner Settling Defendant shall, within 45 days of entry of EPA's request, submit to EPA for review and approval with respect to the Site Property:

      i.      A draft easement/covenant, in substantially the form attached hereto as Appendix D, that is enforceable under the laws of the State of New York, and

      ii.     a current title insurance commitment or some other evidence of title acceptable to EPA, which shows title to the land described in the easement/covenant to be free and clear of all prior liens and encumbrances (except when those liens or encumbrances are approved by EPA or when, despite best efforts, Owner Settling Defendant is unable to obtain release or subordination of such prior liens or encumbrances).

Within 15 days of EPA's approval and acceptance of the easement/covenant and the title evidence, Owner Settling Defendant shall update the title search and, if it is determined that nothing has occurred since the effective date of the commitment to affect the title adversely, record the easement/covenant with the Orange County Clerk's Office. Within 30 days of recording the easement/covenant, Owner Settling Defendant shall provide EPA with a final title insurance policy, or other final evidence of title acceptable to EPA, and a certified copy of the original recorded easement/covenant showing the clerk's recording stamps. Any agreement to Transfer the Site Property pursuant to Paragraph 48 or 49, below, must contain an agreement that the transferee will be bound by the access and institutional controls provisions of this Paragraph. Owner Settling Defendant shall reference such access and institutional controls provisions in any deed transferring the Site Property.

     31.  If EPA so requests, if any other property where access and/or land/water use restrictions are needed to implement the Record of Decision, is owned or controlled by persons other than Owner Settling Defendant, Owner Settling Defendant shall use best efforts to secure from such persons:

     a.  an agreement to provide access thereto for the United States on behalf of EPA and its representatives (including contractors), for the purpose of conducting any activity related to this Consent Decree including, but not limited to, those activities listed in Paragraph 30.a. of this Consent Decree;

     b.  an agreement, enforceable by Owner Settling Defendants and the United States, to

16

refrain from using the Site, or such other property, in any manner that would interfere with or adversely affect the implementation, integrity, or protectiveness of the remedial measures to be performed pursuant to this Consent Decree; and

     c.  upon EPA's request, execute and record in the Orange County Clerk's Office, State of New York , an easement/covenant, running with the land, that (i) grants a right of access for the purpose of conducting any activity related to response actions at the Site Property including, but not limited to, those activities listed in Paragraph 30 a. of this Consent Decree, and (ii) grants the right to enforce the land/water use restrictions listed in Paragraph 31.b. of this Consent Decree, or other restrictions that EPA determines are necessary to implement, ensure non-interference with, or ensure the protectiveness of the remedial measures to be performed at the Site Property. Owner Settling Defendant shall grant the access rights and the rights to enforce the land/water use restrictions to one or more of the following persons:  (i) the State and its representatives, (ii) Settling Defendants and their representatives, and/or (iii) other appropriate grantees, as determined by EPA.  EPA will provide prior notice to Owner Settling Defendant of the identity of the grantee(s).  Owner Settling Defendant shall, within 45 days of EPA's request, submit to EPA for review and approval with respect to the Site Property:

       i.     A draft easement/covenant, in substantially the form attached hereto as Appendix D, that is enforceable under the laws of the State of New York, and

      ii.    a current title insurance commitment or some other evidence of title acceptable to EPA, which shows title to the land described in the easement/covenant to be free and clear of all prior liens and encumbrances (except when those liens or encumbrances are approved by EPA or when, despite best efforts, Settling Defendants are unable to obtain release or subordination of such prior liens or encumbrances).

Within 15 days of EPA's approval and acceptance of the easement/covenant and the title evidence, Owner Settling Defendant shall update the title search and, if it is determined that nothing has occurred since the effective date of the commitment to affect the title adversely, record the easement/covenant with the Orange County Clerk's Office.  Within 30 days of recording the easement/covenant, Owner Settling Defendant shall provide EPA with a final title insurance policy, or other final evidence of title acceptable to EPA, and a certified copy of the original recorded easement/covenant showing the clerk's recording stamps.

     32.    For purposes of Paragraphs 30 and 31 of this Consent Decree, "best efforts" includes the payment of reasonable sums of money in consideration of access, access easements/covenants, land/water use restrictions, restrictive easements/covenants, and/or an agreement to release or subordinate a prior lien or encumbrance.  If (a) any access or land/water use restriction agreements required by Paragraphs 30.a or 30.b of this Consent Decree are not obtained within 45 days of the date of completion of the remedial action, (b) or any access easements/covenants or restrictive easements/covenants required by Paragraph 30.c of this Consent Decree are not submitted to EPA in draft form within 45 days of the date of EPA's

17

request, or (c) Owner Settling Defendant is unable to obtain an agreement pursuant to Paragraph 31.c.(1) from the holder of a prior lien or encumbrance to release or subordinate such lien or encumbrance to the easement/covenant being created pursuant to this Consent Decree within 45 days of the date of EPA's request, Owner Settling Defendant shall promptly notify the United States in writing, and shall include in that notification a summary of the steps that Owner Settling Defendant has taken to attempt to comply with Paragraph 30 or 31 of this Consent Decree. The United States may, as it deems appropriate, assist Owner Settling Defendant in obtaining access or land/water use restrictions, either in the form of contractual agreements or in the form of easements/covenants running with the land, or in obtaining the release or subordination of a prior lien or encumbrance. Settling Defendants shall reimburse the United States in accordance with the procedures in Section VI (Payments for Response Costs), for all costs incurred, direct or indirect, by the United States in obtaining such access, land/water use restrictions, and/or the release/subordination of prior liens or encumbrances including, but not limited to, the cost of attorney time and the amount of monetary consideration paid or just compensation.

33.  Site Management Plan.

    a.  Within 45 days of EPA's request, Owner Settling Defendant shall submit to EPA for review and approval four (4) copies of a Site Management Plan ("SMP").  The SMP shall provide for:
        (i) the proper sampling, handling and treatment and/or disposal of soils excavated below the soil cover's demarcation layer after the Remedial Action is completed;
        (ii) measures that will be taken for the protection of on-Site workers, the public and the environment in the event of future subsurface soil disturbance;
        (iii) for any new construction at the Site, procedures for evaluation of the potential for vapor intrusion, and, if necessary, mitigation of vapor intrusion after the Remedial Action is completed;
        (iv) procedures to confirm that the engineering controls remain in place and remain protective;
        (v) provision for any operation and maintenance required of the components of the remedy;
        (vi) the requirement that the Site Property owner submit periodic certifications that the institutional and engineering controls are in place;
        (vii) monitoring and maintenance of institutional controls including:
            (a) an inventory of any use restrictions on the Site Property;
            (b) periodic certification by the Site Property owner that the institutional controls remain in place and remain effective;
            (c) annual inspection of the Site to determine if soil excavation activities below the soil demarcation layer have occurred;
            (d) annual search of property records to ensure the institutional controls are in place and remain effective; and
            (e) annual notification to local governmental offices, such as the building and zoning offices, of the controls on the Site and review of the records in these offices to ascertain whether any applications or other filings have been made

18

regarding the Site; and
(viii) annual reports to EPA summarizing the findings of the activities noted above in
paragraph 33.a.

b. EPA will either approve the SMP or require modification of it in accordance with the
procedures set forth in Section XIII (EPA Approval of SMP and Easement/Covenant) below, of
this Consent Decree.

34.    If EPA determines that land/water use restrictions in the form of state or local laws,
regulations, ordinances or other governmental controls are needed to implement the remedy
selected in the ROD, ensure the integrity and protectiveness thereof, or ensure non-interference
therewith, Settling Defendants shall cooperate with EPA's efforts to secure such governmental
controls.

35. Notwithstanding any provision of this Consent Decree, the United States retains all of
its access authorities and rights, as well as all of its rights to require land/water use restrictions,
including enforcement authorities related thereto, under CERCLA, RCRA and any other
applicable statute or regulations.

36.    Owner Settling Defendant shall provide to EPA upon request, copies of all
documents and information within their possession or control or that of their contractors or agents
relating to activities at the Site or to the implementation of this Consent Decree, including, but not
limited to, documents relating to the SMP or institutional controls, such as monitoring and
maintenance of easements/covenants pursuant to of this Consent Decree. Owner Settling
Defendant shall also make available to EPA, for purposes of investigation, information gathering,
or testimony, their employees, agents, or representatives with knowledge of relevant facts
concerning the Site.

## XIII.  EPA APPROVAL OF SMP AND EASEMENT/COVENANT

37.  After review of the SMP or easement/covenant which is required to be submitted for
approval by Owner Settling Defendant pursuant to this Consent Decree, EPA, after reasonable
opportunity for review and comment by the State, shall: (a) approve, in whole or in part, the
submission; (b) approve the submission upon specified conditions; (c) modify the submission to
cure the deficiencies; (d) disapprove, in whole or in part, the submission, directing Owner Settling
Defendant modify the submission; or (e) any combination of the above.  However, EPA shall not
modify a submission hereunder without first providing Owner Settling Defendant at least one
notice of deficiency and an opportunity to cure within10 days, except where previous
submission(s) have been disapproved due to material defects and the deficiencies in the
submission under consideration indicate a bad faith lack of effort to submit an acceptable
deliverable.

38.  In the event of approval, approval upon conditions, or modification by EPA, pursuant
to Paragraph 37(a), (b), or (c), Owner Settling Defendant shall proceed to take any action required

19

by the plan, report, or other item, as approved or modified by EPA, subject only to its right to invoke the Dispute Resolution procedures set forth in Paragraphs 43 through 47, below. In the event that EPA modifies the submission to cure the deficiencies pursuant to Paragraph 37(c) and the submission has a material defect, EPA retains its right to seek stipulated penalties, as provided in Section VII.

    39.   Resubmission of SMP or Easement/Covenant.

    a.    Upon receipt of a notice of disapproval pursuant to Paragraph 37(d), Owner Settling Defendant shall, within 10 days or such longer time as specified by EPA in such notice, correct the deficiencies and resubmit the SMP or easement/covenant for approval. Any stipulated penalties applicable to the submission, as provided in Section VII, shall accrue during the 10-day period or otherwise specified period but shall not be payable unless the resubmission is disapproved or modified due to a material defect as provided in Paragraphs 40 and 41.

    b.    Notwithstanding the receipt of a notice of disapproval pursuant to Paragraph 37(d), Owner Settling Defendant shall proceed, at the direction of EPA, to take any action required by any non-deficient portion of the submission. Implementation of any non-deficient portion of a submission shall not relieve Owner Settling Defendant of any liability for stipulated penalties under Section VII.

    40.   In the event that a resubmitted SMP or easement/covenant is disapproved by EPA, EPA may again require Owner Settling Defendant to correct the deficiencies, in accordance with the preceding Paragraphs. EPA also retains the right to modify or develop the SMP or easement/covenant. Owner Settling Defendant shall implement the SMP as modified or developed by EPA, subject only to its right to invoke the procedures set forth in Paragraphs 43 through 47, below.

    41.   If upon resubmission, the SMP or easement/covenant is disapproved or modified by EPA due to a material defect, Owner Settling Defendant shall be deemed to have failed to submit the SMP or easement/covenant timely and adequately unless Owner Settling Defendant invokes the dispute resolution procedures set forth in Paragraphs 43 through 47, below, and EPA's action is overturned pursuant to those Paragraphs. The provisions of Paragraphs 43 through 47, below and Section VII (Stipulated Penalties) shall govern the implementation of the work and accrual and payment of any stipulated penalties during Dispute Resolution. If EPA's disapproval or modification is upheld, stipulated penalties shall accrue for such violation from the date on which the initial submission was originally required, as provided in Section VII.

    42.   The SMP required to be submitted to EPA under this Consent Decree shall, upon approval or modification by EPA, be enforceable under this Consent Decree.

    43.   The dispute resolution procedures of Paragraphs 43 through 47 shall be the exclusive mechanism to resolve disputes arising with respect to the submission or resubmission of the SMP or any easement/covenant pursuant to this Consent Decree. However, the procedures set forth in

20

this Section shall not apply to actions by the United States to enforce obligations of Settling Defendants that have not been disputed in accordance with this Section.

44. Any dispute which arises under or with respect to the submission or resubmission of the SMP or any easement/covenant pursuant to this Consent Decree shall in the first instance be the subject of informal negotiations between the parties to the dispute. The period for informal negotiations shall not exceed 20 days from the time the dispute arises, unless it is modified by written agreement of the parties to the dispute. The dispute shall be considered to have arisen when one party sends the other parties a written Notice of Dispute.

45.    <u>Statements of Position</u>.

a. In the event that the parties cannot resolve a dispute by informal negotiations under the preceding Paragraph, then the position advanced by EPA shall be considered binding unless, within 10 days after the conclusion of the informal negotiation period, Owner Settling Defendant invokes the formal dispute resolution procedures of Paragraphs 45 and 46 by serving on the United States a written Statement of Position on the matter in dispute, including, but not limited to, any factual data, analysis or opinion supporting that position and any supporting documentation relied upon by Owner Settling Defendant.

b. Within 14 days after receipt of Owner Settling Defendant's Statement of Position, EPA will serve on Owner Settling Defendant its Statement of Position, including, but not limited to, any factual data, analysis, or opinion supporting that position and all supporting documentation relied upon by EPA. EPA's Statement of Position shall include a statement as to whether formal dispute resolution should proceed under Paragraph 46. Within 14 days after receipt of EPA's Statement of Position, Owner Settling Defendant may submit a Reply.

46. Formal dispute resolution shall be conducted pursuant to the procedures set forth in this Paragraph. Nothing in this Consent Decree shall be construed to allow any dispute by Settling Defendants regarding the validity of the ROD's provisions.

a. An administrative record of the dispute shall be maintained by EPA and shall contain all statements of position, including supporting documentation, submitted pursuant to Paragraphs 45 and 46. Where appropriate, EPA may allow submission of supplemental statements of position by the parties to the dispute.

b. The Director of the Emergency and Remedial Response Division, EPA Region 2, will issue a final administrative decision resolving the dispute based on the administrative record described in Paragraph 46.a. This decision shall be binding upon Owner Settling Defendant, subject only to the right to seek judicial review pursuant to Paragraph 46.c. and d.

c. Any administrative decision made by EPA pursuant to Paragraph 46.b. shall be reviewable by this Court, provided that a motion for judicial review of the decision is filed by Owner Settling Defendant with the Court and served on all Parties within 10 days of receipt of

21

EPA's decision. The motion shall include a description of the matter in dispute, the efforts made by the parties to resolve it, the relief requested, and the schedule, if any, within which the dispute must be resolved to ensure orderly implementation of this Consent Decree. The United States may file a response to Owner Settling Defendant's motion.

       d. In proceedings on any dispute governed by this Paragraph, Owner Settling Defendant shall have the burden of demonstrating that the decision of the Emergency and Remedial Response Division Director is arbitrary and capricious or otherwise not in accordance with law. Judicial review of EPA's decision shall be on the administrative record compiled pursuant to Paragraph 46.a.

    47. The invocation of formal dispute resolution procedures under this Section shall not extend, postpone or affect in any way any obligation of Owner Settling Defendant under this Consent Decree, not directly in dispute, unless EPA or the Court agrees otherwise. Stipulated penalties with respect to the disputed matter shall continue to accrue but payment shall be stayed pending resolution of the dispute as provided in Paragraph 46. Notwithstanding the stay of payment, stipulated penalties shall accrue from the first day of noncompliance with any applicable provision of this Consent Decree. In the event that Owner Settling Defendant does not prevail on the disputed issue, stipulated penalties shall be assessed and paid as provided in Section VII (Stipulated Penalties).

## XIV. SALE OF SITE PROPERTY BY OWNER SETTLING DEFENDANT

    48. If the Site Property is to be sold to Leyland Alliance, LLC or any affiliate thereof (hereinafter collectively referred to as "Leyland"), pursuant to an agreement drafted substantially in accordance with the Development Agreement attached hereto as Appendix C (hereinafter referred to as the "Conveyance Agreement"), then thirty (30) days or more prior to Transfer of the Site Property, Owner Settling Defendant shall provide EPA with a closing statement which includes the Conveyance Agreement and sets forth the agreed upon purchase price, adjustments, setoffs and apportionments (hereinafter, "Closing Statement"). The Closing Statement shall reflect the amount due to Owner Settling Defendant at Transfer, which shall be the purchase price plus or minus any offsets, adjustments or apportionments (hereinafter, "Net Sales Proceeds") as provided for in the Conveyance Agreement and which shall substantially conform to paragraphs 2.5, 3.7 and 5.1 of the Development Agreement. EPA will review the Closing Statement to determine if it is appropriate to release its CERCLA 107(l) lien and waive a 107(r) lien, which determination shall be made based on whether the Site Property is being transferred at Fair Market Value and the Net Sales Proceeds have been appropriately calculated. Such a determination shall be made in EPA's sole and unreviewable discretion. If EPA determines that it is appropriate to release its CERCLA 107(l) lien and waive a 107(r) lien, EPA will provide a copies of the proposed release and waiver in recordable form to Owner Settling Defendant at the time of the Transfer. If the Closing Statement demonstrates that the Net Sales Proceeds will be greater than $1,933,000.00, then Owner Settling Defendant shall remit any amount in excess of $1,933,000.00 to EPA at the time of Transfer. If the Net Sales Proceeds will not be greater than $1,933,000.00,

22

no further payments to EPA are required under this Section.

49. If the Site Property is to be transferred to a party other than Leyland, then thirty (30) days or more prior to Transfer, Owner Settling Defendant shall provide EPA with the other Transfer Agreement ("Other Agreement") and a Closing Statement which identifies the transferee, sets forth the agreed upon purchase price, adjustments, setoffs and apportionments for the Transfer of the Site Property. The Closing Statement shall reflect the amount due at Transfer, which shall be the purchase price plus or minus any offsets, adjustments or apportionments (hereinafter, "Other Net Sales Proceeds") as provided for in the Other Agreement. EPA will review the Closing Statement to determine if it is appropriate to release its CERCLA 107(l) lien and waive a107(r) lien, which determination shall be made based on whether the Site Property is being transferred at Fair Market Value and the Other Net Sales Proceeds have been appropriately calculated. Such a determination shall be made in EPA's sole and unreviewable discretion. If EPA determines that it is appropriate to release its CERCLA 107(l) lien and waive a 107(r) lien, EPA will provide copies of the proposed release and waiver in recordable form to Owner Settling Defendant at the time of the Transfer. If the Closing Statement demonstrates that the Other Net Sales Proceeds will be greater than $1,933,000.00, then Owner Settling Defendant shall remit any amount in excess of $1,933,000.00 to EPA at the time of Transfer. If the Other Net Sales Proceeds will not be greater than $1,933,000.00, no further payments to EPA are required under this Section.

## XV.  FUTURE COST RECOVERY

50.  a.  The United States and Settling Defendants agree that proceeds from any future cost recoveries obtained by Settling Defendants from any person which has received notification as of the date of entry of this Consent Decree from EPA that such person is considered to be a potentially responsible party ("PRP") at the Site, and which is not an Other Settling Party, shall be divided between the United States and the Settling Defendants according to the following formula. The Settling Defendants may first recover a reasonable amount, agreed upon by EPA, for attorneys fees and expenses expended in pursuing claims against other persons who are or may be liable at the Site. The remaining amount shall be referred to hereinafter as the "Net Settlement Proceeds". Fifty percent (50%) of the Net Settlement Proceeds shall be paid to the United States and the remainder shall be paid to the Settling Defendants. In exchange for receipt of fifty percent of the Net Settlement Proceeds, the United States may add such persons as Other Settling Parties to this Consent Decree or agree to participate in a future settlement with such persons, in the sole unreviewable discretion of the United States. In the event that the United States does not add such person(s) to this Consent Decree, or agree to participate in a future settlement with such person(s), then the proceeds sharing called for in this subparagraph shall not apply.

b.  The Settling Defendants may seek to add one or more persons to this Consent Decree or a future settlement with the United States who have not received notification from EPA that such persons are considered to be PRPs at the Site. If so, Settling Defendants shall submit a written request to the United States to add such person(s) to this Consent Decree or to request the

23

participation of the United States in a future settlement with such person(s). Such written request shall (i) state the cumulative amount of proceeds that such person(s) agree to pay in settlement and (ii) include all evidence Settling Defendants have relevant to whether such persons are PRPs under Section 107 of CERCLA, 42 U.S.C. § 9607. The United States, in its sole unreviewable discretion, may add such person(s) to this Consent Decree, or agree to participate in a future settlement with such person(s). If, after a review of the PRP evidence, the United States, in its sole unreviewable discretion, agrees to include such person(s) in this Consent Decree or a future settlement, Settling Defendants shall pay to the United States fifty percent (50%) of the Net Settlement Proceeds with respect to each such person. In the event that the United States does not add such person(s) to this Consent Decree, or agree to participate in a future settlement with such person(s), then the proceeds sharing called for in this subparagraph shall not apply.

c. Upon request by one or more of the Settling Defendants, EPA, in its sole unreviewable discretion, may issue request for information letters pursuant to Section 104(e) of CERCLA, 42 U.S.C. § 9604(e), to parties which EPA believes may have a nexus to the Site.

d. Notwithstanding subparagraphs a. and b. above, this Consent Decree does not address a percentage distribution between the United States and Settling Defendants with respect to (1) settlements with any persons once the accumulated Net Settlement Proceeds exceed $2,000,000 and/or (2) with respect to settlements with any persons who may be considered PRPs based on arranging for the treatment or disposal of batteries at the Site. If, after receipt of a written request to add any person(s) under this subparagraph who has expressed an interest in settling with Settling Defendants, and a review of the PRP evidence submitted by Settling Defendants, the United States, in its sole unreviewable discretion, agrees to include such person(s) in this Consent Decree or a future settlement, the Parties will then determine an appropriate percentage of Net Settlement Proceeds to be provided to the United States, based on the totality of the circumstances, provided that the Net Settlement Proceeds distributed to Settling Defendants shall in no event be less than 20%. In the event that the United States does not agree to add such person(s) in this Consent Decree or a future settlement, then the Parties are free to pursue such person(s) independently.

## XVI. **RETENTION OF RECORDS**

51. Until 15 years after the entry of this Consent Decree, Settling Defendants and Other Settling Parties shall preserve and retain all records, reports, or information (hereinafter referred to as "records") now in their possession or control, or which come into their possession or control, that relate in any manner to response actions taken at the Site or the liability of any person under CERCLA with respect to the Site, regardless of any corporate retention policy to the contrary.

52. After the conclusion of the 15-year document retention period in the preceding paragraph, Settling Defendants and Other Settling Parties shall notify EPA and DOJ at least 90 days prior to the destruction of any such records, and, upon request by EPA or DOJ, Settling Defendants shall deliver any such records to EPA. Settling Defendants and Other Settling Parties may assert that certain records are privileged under the attorney-client privilege or any other

24

privilege recognized by federal law. If Settling Defendants and/or Other Settling Parties assert such a privilege, they shall provide Plaintiff with the following: 1) the title of the record; 2) the date of the record; 3) the name, title, affiliation (*e.g.*, company or firm), and address of the author of the record; 4) the name and title of each addressee and recipient; 5) a description of the subject of the record; and 6) the privilege asserted. If a claim of privilege applies only to a portion of a record, the record shall be provided to Plaintiff in redacted form to mask the privileged information only. Settling Defendants and Other Settling Parties shall retain all records that they claim to be privileged until the United States has had a reasonable opportunity to dispute the privilege claim and any such dispute has been resolved in the Settling Defendants' and/or Other Settling Parties' favor. However, no records created or generated pursuant to the requirements of this or any other settlement with the EPA pertaining to the Site shall be withheld on the grounds that they are privileged.

53. Each Settling Defendant and each Other Settling Party hereby certifies that, to the best of its knowledge and belief, after thorough inquiry, it has not altered, mutilated, discarded, destroyed or otherwise disposed of any records, reports, or information relating to its potential liability regarding the Site since notification of potential liability by the United States or the filing of suit against it regarding the Site and that it has fully complied with any and all EPA requests for information pursuant to Sections 104(e) and 122(e) of CERCLA, 42 U.S.C. §§ 9604(e) and 9622(e), and Section 3007 of RCRA, 42 U.S.C. § 6972.

## XVII. NOTICES AND SUBMISSIONS

54. Whenever, under the terms of this Consent Decree, notice is required to be given or a document is required to be sent by one Party to another, it shall be directed to the individuals at the addresses specified below, unless those individuals or their successors give notice of a change to the other Settling Defendants in writing. Written notice as specified herein shall constitute complete satisfaction of any written notice requirement of the Consent Decree with respect to the United States, EPA, DOJ, and Settling Defendants, respectively.

**As to the United States:**

Chief, Environmental Enforcement Section
Environment and Natural Resources Division
United States Department of Justice (DJ # 90-11-2-1134/1)
Post Office Box 7611
Washington, D.C. 20044-7611

Chief, New York/Caribbean Superfund Branch
Office of Regional Counsel
United States Environmental Protection Agency - Region 2
290 Broadway - 17th Floor
New York, New York 10007
Attn: Consolidated Iron Site Attorney

25

Chief, New York Remediation Branch
Emergency and Remedial Response Division
United States Environmental Protection Agency - Region 2
290 Broadway - 20th Floor
New York, New York 10007
Attn: Consolidated Iron Site Project Manager

**As to Settling Defendants and Other Settling Parties:**

Edan Dionne, Director
Corporate Environmental Affairs
International Business Machines Corp.
294 Route 100
Somers, NY 10589

Connell Limited Partnership
John Curtin, General Counsel
One International Place
Boston, MA 02110

Northrop Grumman Shipbuilding
ATTN: Robert J. Ariatti
Law Dept (M/S 1011-09)
1000 Access Road
P.O. Box 149
Pascagoula, MS 39568-0149

Northrop Grumman Corporation
ATTN: Law Dept (0110/M/S C-451)
755 Colshire Drive
McLean, VA 22102-7508

Honorable John C. Tkazyik, Mayor
City of Poughkeepsie
City Hall Municipal Building
Poughkeepsie, NY 12601

Jean McGrane, City Manager
City of Newburgh
83 Broadway, City Hall
Newburgh, NY 12550

26

## XVIII.  RETENTION OF JURISDICTION

55.  This Court shall retain jurisdiction over this matter for the purpose of interpreting and enforcing the terms of this Consent Decree.

## XIX.  INTEGRATION/APPENDICES

56.  This Consent Decree and its appendices constitute the final, complete and exclusive agreement and understanding among the Parties with respect to the settlement embodied in this Consent Decree.  The Parties acknowledge that there are no representations, agreements or understandings relating to the settlement other than those expressly contained in this Consent Decree.  The following appendices are attached to and incorporated into this Consent Decree:

"Appendix A" is the list of Other Settling Parties
"Appendix B" is the map of the Site
"Appendix C" is the Development Agreement
"Appendix D" is the draft Environmental Easement

## XX.  MODIFICATIONS TO THIS CONSENT DECREE

57.  a.  Material modifications to this Consent Decree shall be in writing, signed by the Parties, and shall be effective upon approval by the Court.  Non-material modifications to this Consent Decree shall be in writing and shall be effective when signed by the Parties.

b.  Settling Defendants agree that this Consent Decree may be modified to add more parties as Other Settling Parties and hereby designate Michael Zarin of Zarin & Steinmetz to sign modifications on behalf of all Settling Defendants.

## XXI.  LODGING AND OPPORTUNITY FOR PUBLIC COMMENT

58.  This Consent Decree shall be lodged with the Court for a period of not less than 30 days for public notice and comment.  The United States reserves the right to withdraw or withhold its consent if the comments regarding the Consent Decree disclose facts or considerations which indicate that this Consent Decree is inappropriate, improper, or inadequate.  Settling Defendants and Other Settling Parties consent to the entry of this Consent Decree without further notice.

59.  If for any reason this Court should decline to approve this Consent Decree in the form presented, this agreement is voidable at the sole discretion of any party and the terms of the agreement may not be used as evidence in any litigation between the Parties.

## XXII.  SIGNATORIES/SERVICE

60.  Each undersigned representative of a Settling Defendant to this Consent Decree and the Assistant Attorney General for the Environment and Natural Resources Division of the United

27

States Department of Justice, certifies that he or she is authorized to enter into the terms and conditions of this Consent Decree and to execute and bind legally such Party to this document.

61. Each Settling Defendant hereby agrees not to oppose entry of this Consent Decree by this Court or to challenge any provision of this Consent Decree, or any modification pursuant to paragraph 57 thereto, unless the United States has notified Settling Defendants and Other Settling Parties in writing that they no longer support entry of the Consent Decree.

62. Each Settling Defendant and Other Settling Party shall identify, on the attached signature page, the name and address of an agent who is authorized to accept service of process by mail on behalf of that Party with respect to all matters arising under or relating to this Consent Decree. Settling Defendants and Other Settling Parties hereby agree to accept service in that manner and to waive the formal service requirements set forth in Rule 4 of the Federal Rules of Civil Procedure and any applicable local rules of this Court, including but not limited to, service of a summons.

## XXIII.  **FINAL JUDGMENT**

63. Upon approval and entry of this Consent Decree by the Court, this Consent Decree shall constitute the final judgment between and among the United States, Settling Defendants and Other Settling Parties. The Court finds that there is no just reason for delay and therefore enters this judgment as a final judgment under Fed. R. Civ. P. 54 and 58.

SO ORDERED THIS ____ DAY OF _____, 2008.


_____
United States District Judge

28

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of <u>United States v. City of Newburgh</u>, *et al.* , relating to the Consolidated Iron and Metal Superfund Site.

## FOR THE UNITED STATES OF AMERICA

8/20/08
_____
Date

Ronald Tenpas
Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice
Washington, D.C. 20530


Michael J. Garcia
United States Attorney
for the Southern District of New York


08/20/08
_____
Date

By:    Pierre Armand
Assistant United States Attorney
Southern District of New York
U.S. Department of Justice
86 Chambers St., 3rd Floor
New York, NY 10007
Tel No. 212-637-2724
FAX No. 212-637-2730

29

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of <u>United States v.</u> <u>City of Newburgh,</u> *et al.* relating to the Consolidated Iron and Metal Superfund Site.


7/17/08
Date

George M. Pavlou, Acting Director
Emergency and Remedial Response Division
U.S. Environmental Protection Agency,
Region 2
290 Broadway, 19th Floor
New York, New York 10007-1866

# EXHIBIT A

**(Part 2 of 3)**

30

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of <u>United States v. City of Newburgh, <i>et al.</i></u> relating to the Consolidated Iron and Metal Superfund Site.

FOR CITY OF NEWBURGH
SETTLING DEFENDANT

Date: 7/8/08          Signature:

Name (print)  Jean-Ann McGrane

Title         City Manager

Address:      83 Broadway, Newburgh, New York 12550

Agent Authorized to Accept Service on Behalf of Above-signed Party:

Name:    Geoffrey Chanin, Esq.

Title:   Corporation Counsel, City of Newburgh

Address: 83 Broadway, Newburgh, New York 12550

30

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of <u>United States v. City of Newburgh, <i>et al.</i></u> relating to the Consolidated Iron and Metal Superfund Site.

FOR _____ City of Poughkeepsie
SETTLING DEFENDANT

Date: 6/30/08

Signature: _____

Name (print)    John C. Tkazyik

Title    Mayor

Address:    P.O. Box 300

Poughkeepsie, NY 12602

Agent Authorized to Accept Service on Behalf of Above-signed Party:

Name:    G. Brian Morgan, Esq.
         Corporation Counsel
Title:   City of Poughkeepsie
         P.O. Box 300
Address: Poughkeepsie, NY 12602

30

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of <u>United States v.</u> <u>City of Newburgh, et al.</u> relating to the Consolidated Iron and Metal Superfund Site.

FOR    Connell Limited Partnership
SETTLING DEFENDANT

Date: 7/2/08

Signature:

Name (print)    John Curtin

Title    General Counsel

Address:    One International Place

Boston, MA  02110

Agent Authorized to Accept Service on Behalf of Above-signed Party:

Name:    Patrick van der Voorn

Title:    Counsel for Connell Limited Partnership

Address: WilmerHale

60 State Street

Boston, MA  02109

30

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of <u>United States v. City of Newburgh, <i>et al.</i></u> relating to the Consolidated Iron and Metal Superfund Site.

FOR  *IBM Corporation*
SETTLING DEFENDANT

Date: *July 7, 2008*    Signature: *Edah*

Name (print)  *Edah Dionne*

Title  *Director, Corporate Environmental Affairs*

Address:  *294 RTD 100 , Somers, NY 10589*

Agent Authorized to Accept Service on Behalf of Above-signed Party:

Name:  Louise Novak

Title:  None

Address: New Orchard Road, Armonk, NY   10504

30

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of United States v. City of Newburgh, *et al.* relating to the Consolidated Iron and Metal Co. Superfund Site.

FOR SETTLING DEFENDANT [                    ]

Date: 7 July 08

[Names and address of Settling Defendant's signatories]

CHRIS KASTNER
VICE PRESIDENT, CONTRACTS
NORTHROP GRUMMAN SHIP SYSTEMS, INC.
P.O. BOX 149, PASCAGOULA, MS 39568-0149

Agent Authorized to Accept Service on Behalf of Above-signed Party:

Name:  ROBERT J ARIATTI

Title:  SENIOR COUNSEL

Address:  NORTHROP GRUMMAN SHIP SYSTEMS, INC
          LEGAL DEPT.
          P.O. BOX 149
          PASCAGOULA, MS  39568-0149

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of United States v. City of Newburgh, *et al.* relating to the Consolidated Iron and Metal Co. Superfund Site.

FOR OTHER SETTLING PARTY
BERG'S AUTO

Date: 6-26-08

Name: Ronald BERG

Title: Pres / owner

Address: 4838 SW Lake Grove Cir.
Palm City, Fl. 34990

Agent Authorized to Accept Service on Behalf of Above-Signed Party:

Alyse Terhune, Esq.
Jacobowitz & Gubits, LLP
504 Broadway
Monticello, NY 12701

CONSOLIDATED RAIL CORPORATION

Date: June 27, 2008

Name: Janett L. Scognelli

Title: Attorney

Address: 500 Water Street, 114 tn Floor

Jacksonville, Fla. 32202

Agent Authorized to Accept Service on Behalf of Above-Signed Party:

Thomas J. Fucillo, Esq.
Menter, Rudin & Trivelpiece, P.C.
Suite 200
308 Maltbie Street
Syracuse, NY 13204-1498

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of United States v. City of Newburgh, *et al.* relating to the Consolidated Iron and Metal Co. Superfund Site.

FOR OTHER SETTLING PARTY
EISNER BROS., INC.

Date: June 30, 2008

Name: PHILIP N. GITLEN

Title: Authorized Signatory

Address: One Commerce Plaza - Suite 1900

Albany NY 12260

Agent Authorized to Accept Service on Behalf of Above-Signed Party:

Philip H. Gitlen, Esq.
Whiteman Osterman & Hanna LLP
One Commerce Plaza LLP
Albany, NY 12260

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of United States v. City of Newburgh, *et al.* relating to the Consolidated Iron and Metal Co. Superfund Site.

FOR OTHER SETTLING PARTY
ERIC ALLEVA AND SEVEN X MOTORS, INC.

Date: _6/29/08_

_Ercoca Alleva_

Name: _____

Title: _____

Address: _____

_____

Agent Authorized to Accept Service on Behalf of Above-Signed Party:

Lisa M. Penpraze, Esq.
Segel, Goldman, Mazzotta & Siegel, P.C.
9 Washington Square
Albany, NY 12205

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of United States v. City of Newburgh, *et al.* relating to the Consolidated Iron and Metal Co. Superfund Site.

FOR OTHER SETTLING PARTY
FORD MOTOR COMPANY

Date: *June 26, 2008*

Name: **Robert T. Biskup**

Title: **Assistant Secretary**

Address: *3 Parklane Blvd, Suite 1500W*

*Dearborn, MI 48126*

Agent Authorized to Accept Service on Behalf of Above-Signed Party:

Michael A. Burgin, Esq.
Counsel
Ford Motor Company
Office of the General Counsel
3 Parklane Blvd.
Suite 1500W
Dearborn, MI 48126-2568

31

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of <u>United States v.</u>
<u>City of Newburgh,</u> <u>et al.</u> relating to the Consolidated Iron and Metal Superfund Site.

FOR *HYATT'S GARAGE INC*
OTHER SETTLING PARTY

Date: *6/29/08*

Signature: *Elwin Hyatt*

Name (print) *ELWIN HYATT*

Title *PRES*

Address: *2612 Rt52 HOPEWELL JCT NY 12533*

Agent Authorized to Accept Service on Behalf of Above-signed Party:

Name: *JENNIFER COGHLAN*

Title: *SIVE, PAGET & RIESEL*

Address: *460 PARK AVE*
*NY   NY 10022*

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of United States v. City of Newburgh, *et al.* relating to the Consolidated Iron and Metal Co. Superfund Site.

FOR OTHER SETTLING PARTY
JOHN H. LUTJENS

Date: _6/26/2008_

_John H. Lutjens_

Name: _____

Title: _____

Address: _____

_____

Agent Authorized to Accept Service on Behalf of Above-Signed Party:

Henry Christensen
Norton & Christensen
60 Erie St.
Goshen, NY 10924

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of United States v. City of Newburgh, *et al.* relating to the Consolidated Iron and Metal Co. Superfund Site.

FOR OTHER SETTLING PARTY
KRAFT FOODS GLOBAL, INC.

Date: 6/26/2008

Name: Jeffrey Srulovitz

Title: Chief Environmental and Safety Counsel

Address: Three Lakes Dr.

Northfield, IL 60015

Agent Authorized to Accept Service on Behalf of Above-Signed Party:

Jeffrey S. Srulovitz
Chief Environmental and Safety Counsel
Kraft Foods Global, Inc.
Three Lakes Drive
Northfield, IL 60093

THE UNDERSIGNED PARTIES enter into this Consent Decree in the matter of United States v. City of Newburgh, *et al.* relating to the Consolidated Iron and Metal Co. Superfund Site.

FOR OTHER SETTLING PARTIES
STEPHEN PIDALA
STEVE PIDALA TRUCKING LTD.
STEVE PIDALA TRUCKING LTD., d/b/a
    PIDALA LANDSCAPE MATERIAL AND
    SUPPLY
S.P. EQUIPMENT, INC.

Date: 6-26-08

Name: Stephen Pidala

Title: President

Address: PO Box 51

Cold Spring, NY 10516

Agent Authorized to Accept Service on Behalf of Above-Signed Party:

Andrew W. Gilchrist, Esq.
Jonathon B. Tingley, Esq.
Tuczinski, Cavalier, Gilchrist & Collura, P.C.
54 State Street, Suite 803
Albany, NY 12207

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of United States v. City of Newburgh, *et al.* relating to the Consolidated Iron and Metal Co. Superfund Site.

FOR OTHER SETTLING PARTY
VILLAGE OF SLOATSURG

Date: June 27, 2008

Name: Carl S. Wright

Title: Mayor

Address: 96 Orange Turnpike

Sloatsburg, NY 10974

Agent Authorized to Accept Service on Behalf of Above-Signed Party:

Joel Grossbarth, Esq.
Village of Sloatsburg
96 Orange Tpke
Sloatsburg, NY 10974

APPENDIX A

## OTHER SETTLING PARTIES

Berg's Auto
Consolidated Rail Corporation
Eisner Brothers, Inc.
Eric Alleva and Seven X Motors, Inc.
Ford Motor Company
Hyatt's Garage, Inc.
John H. Lutjens
Kraft Foods Global, Inc.
Stephen Pidala
Steve Pidala Trucking Ltd.
Steve Pidala Ltd., d/b/a Pidala Landscape Material & Supply
S.P. Equipment, Inc.
Village of Sloatsburg

APPENDIX B



C:\IMS\GIS\ConsolidatedIron\GISProjectFile\ArcMap Projects\Figure_1_2_site_map.mxd

Former Office

Former Garage

Former Metal Shear Building

Former Compactor Bailer

Former Smelter

Note: aerial photograph dated April 2001

**LEGEND**

Former Ash/ Slag Pile

Former Soil Pile

Former Underground Storage Tank

Former Tire Pile

Former Scrap Metal Pile

Site Boundary

0   25   50      100      150 Feet

**Figure 1-2
Site Map**

Consolidated Iron and Metal Superfund Site
Newburgh, Orange County, New York

CDM

APPENDIX C

Final Execution Copy
June 20, 2007 (2:00 pm)

(

**DEVELOPMENT AGREEMENT**
**BY AND BETWEEN**
**CITY OF NEWBURGH AND**
**LEYLAND ALLIANCE LLC**
**DATED AS OF JUNE    , 2007**

**Final Execution Copy**
**June 20, 2007 (11:15 am)**

## <u>LIST OF SCHEDULES</u>

Schedule A     Description of Project Area – Consolidated Iron Site, Boat Launch Property, Balance of City Property and Non-City Property

Schedule A-1  Tax Parcel Map of Project Area

Schedule B     Conceptual Plan

Schedule C     Escrow Agreement

2

**Final Execution Copy**
**June 20, 2007 (11:15 am)**

A Development Agreement dated as of June    , 2007, by and between the CITY OF NEWBURGH, a New York municipal corporation with offices at 83 Broadway, Newburgh, New York (the "City") and LEYLAND ALLIANCE LLC, a limited liability company organized under the laws of the State of Delaware with offices at 16 Sterling Lake Road, Tuxedo, New York (the "Developer").

WHEREAS, the City, or City agencies, are the record owners of those parcels of land located along or in proximity to the Hudson River waterfront in the City of Newburgh, County of Orange, New York, described on Schedule A as the Consolidated Iron Site, the Boat Launch Property and the Balance of City Property, said parcels also being described on Schedule A-1 by reference to the City of Newburgh Tax Map (collectively, the "City Property"); and

WHEREAS, there are certain additional parcels of land, comprising approximately nine (9) acres (with a portion of such acreage apparently under water), also located along or in proximity to the Hudson River waterfront in the City of Newburgh, County of Orange, New York, as described on Schedule A and Schedule A-1 (collectively, the "Non-City Property); and

WHEREAS, a portion of the City Property, identified as the "Boat Launch Property" on Schedule A, is owned by the City subject to a Co-operative Agreement between the City and the New York State Department of Environmental Conservation ("DEC") dated June 6, 1997 (the "Co-operative Agreement"); and

WHEREAS, the City desires to facilitate redevelopment and enhance public access to the waterfront and promote a mixture of residential, commercial, office and other appropriate uses on and in the vicinity of the City Property and Non-City Property; and

WHEREAS, the City and the Developer wish to develop and construct or facilitate development and construction of a mix of residential uses, retail space, professional office space, hospitality with meeting and event space, public open space and parking for such uses (the "Project") on and in the vicinity of the City Property and Non-City Property (collectively, the City Property and Non-City Property are sometimes referred to herein as the "Project Area," and each individual parcel within the Project Area is referred to as a "Project Parcel" ); and

WHEREAS, the City and the Developer entered into an Exclusivity and Planning Agreement dated September 22, 2006 (the "Exclusivity and Planning Agreement"), to commence the planning process for the Project Area and to establish the general framework and scope of this Agreement; and

WHEREAS, the Developer, pursuant to the Exclusivity and Planning Agreement, provided an escrow deposit of $50,000.00 to reimburse the City for outside consultant and other expenses incurred by the City in furtherance of the Project; and

3

WHEREAS, the Developer, together with its consultants, undertook an extensive Charrette planning process, which involved the participation of community groups and individuals interested in redevelopment of the Project Area, as well as other areas within the City; and

WHEREAS, the Developer and its consultants issued a Final Charrette Report dated May 9, 2007, which, among other things, identifies a proposed conceptual plan for the Project; and

WHEREAS, the Developer, in conjunction with the Final Charrette Report, has prepared a comprehensive Conceptual Plan dated June 14, 2007 (the "Conceptual Plan"), attached hereto as Schedule B, outlining conceptually the uses, locations, height, scale, amenities, character and scope of potential development of the Project Area; and

WHEREAS, the City Council of the City of Newburgh (the "City Council") has reviewed the Conceptual Plan, and Final Charrette Report; and

WHEREAS, the City Council endorses the Final Charrette Report and Conceptual Plan as presenting a suitable land use planning vision for the Project and Project Area; and

WHEREAS, the Developer and the City are entering into this Agreement in order to set forth certain understandings among them with respect to: (i) the environmental review concerning the implementation of the Project, subject to the New York State Environmental Quality Review Act and the regulations promulgated thereunder by the Commissioner of the New York State Department of Environmental Conservation (collectively, "SEQRA") and (ii) the obligations of the parties to be performed prior to the approval, execution and delivery of a Land Acquisition and Development Agreement ("LADA") between the Developer and the City with respect to the Project Area; and

WHEREAS, the parties agree and acknowledge that although by this Agreement the City covenants in good faith to diligently and reasonably seek to perform its obligations hereunder, the City can not commit to any particular outcome regarding the Project, Project Area or future related proposed projects under SEQRA, or the Eminent Domain Procedure Law ("EDPL"), and the respective regulations thereof, and that the covenants, conditions and agreements set forth herein are subject to and conditioned upon compliance with each of the findings and determinations to be made thereunder; and

WHEREAS, the City and the Developer wish such development of the Project Area to take place in a timely and expeditious manner; and

WHEREAS, in furtherance of the above, the City Council has on this date approved this Agreement for execution by the City Manager on behalf of the City; and

4

**Final Execution Copy**
**June 20, 2007 (11:15 am)**

NOW, THEREFORE, in consideration of the mutual covenants herein contained and other good and valuable consideration, the parties agree, as follows:

## ARTICLE I

## PROPOSED PROJECT

1.1     The Project.  The Project is expected to include a mix of residential units with opportunity for neighborhood retail and live work arrangements, destination retail, hotel, office, open space and recreational and other public space, as depicted on the Conceptual Plan annexed as Schedule B.  The City acknowledges that Developer may desire to make changes to the Conceptual Plan from time to time, based on additional due diligence and planning.  The City's approval with respect to any such changes shall not be unreasonably withheld or delayed, subject to any and all governmental reviews hereunder, including, SEQRA. The Project development program, as currently envisioned in the Conceptual Plan, includes 1170 residential units, 105,000 square feet of destination retail, 35,000 square feet of neighborhood retail, 50,000 square feet of flex retail associated with Live-Work units, 100,000 square feet of office space, 150 hotel rooms with banquet facilities, 2180 structured parking spaces, plus additional on and off street parking.  In addition, the Project development program, as currently envisioned in the Conceptual Plan, includes approximately 4.5 acres of open space and public amenities, including parks, green-space, and improvements to the Broadway corridor.  It is understood that the development program reflected in the Conceptual Plan is subject to change, as noted above, including, but not limited to, the development program for the Non-City Property, which plan is still undergoing further refinement and review by the parties.  The parties contemplate a rezoning of the Project Area to facilitate the Project, and potential future development along the waterfront.  The Developer shall include proposed rezoning of the Project Area, and may include proposed changes to the City's Zoning Code regarding certain areas outside the Project Area on the waterfront, as part of the Project to be reviewed under SEQRA hereunder.

1.2     Project Phases.    The parties acknowledge that as of the date hereof, the plans for the phasing of the Project have not yet been formulated beyond the general planning concepts set forth in the Conceptual Plan.  The Developer shall submit to the City updated phasing plans for specific phases of the Project during the SEQRA process.

1.3     Municipal Objectives.    The parties agree that redevelopment of the Project Area as set forth herein, and in the Conceptual Plan, shall be in substantial harmony with the City's goals and visions for the redevelopment and sustainability of the Project Area, which Project goals and descriptions may be modified, from time to time, upon mutual agreement of the parties hereto.  The parties further agree that the Developer shall provide customary and legally authorized financial or other assurances that it will construct and/or fund publicly dedicated Project Infrastructure and Shared Infrastructure determined to be the financial responsibility of the Developer within the Project Area to the reasonable satisfaction of the City, which may include letters of credit and/or performance bonds.

5

**Final Execution Copy**
**June 20, 2007 (11:15 am)**

      1.4.   Development Concepts for Contiguous Areas.   Provided that the Developer is not in default of this Agreement, the Developer shall have the right to submit to the City one or more proposed concept plans, similar in level of detail to the Conceptual Plan, with respect to redevelopment proposed to be undertaken by the Developer in any area or areas contiguous with or in proximity to the boundaries of the Project ("Contiguous Area"), to the extent that the inclusion of such area or areas is reasonably necessary or appropriate in order to support the economic feasibility, marketability, legal compliance, visual character, or vehicular or pedestrian accessibility, of the Project. Upon approval by the City Council, which approval or denial shall be granted in the City Council's reasonable discretion: (i) the Conceptual Plan shall be deemed modified to incorporate the concept plan so approved for the Contiguous Area; (ii) a description of the Contiguous Area shall be annexed to this Agreement as an additional exhibit thereto, and (iii) such proposed redevelopment and Contiguous Area shall become part of the Project and Project Area for all purposes under this Agreement without the need for any other or further act by any the parties, except as may be required for compliance with applicable requirements of SEQRA.

      1.5   Work Force Housing.   The LADA shall include provisions for the Developer to build up to ten percent (10%) of the number of residential units within the Project as "Work Force Housing." Work Force Housing shall mean residential units restricted for not less than thirty (30) years to occupancy by households whose income (at the time of lease or purchase) is less than or equal to one hundred twenty-five percent (125%) of the Orange County median income as determined by the United States Department of Housing and Urban Development. No less than five percent (5%) of such Work Force Housing shall be built within the Project Area. The other five percent (5%) may be built outside the Project Area within the City of Newburgh.

      1.6   Local Community Benefit Programs.  The City of Newburgh is privileged to have a diverse community. The City encourages all contractors and developers selected to do business with the City to make their onsite workforce and local vendors a reflection of the community. Prior to entering into a LADA, the parties shall endeavor in good faith to negotiate a local hiring and vendor program in relation to the construction and ongoing operation and maintenance of the Project.

## ARTICLE II

### DEVELOPMENT ACTIONS AND RESPONSIBILITIES

      2.1   Project Entities; Negotiation of LADAs.   Upon compliance with all applicable SEQRA and other regulations, and upon the City's enactment of any required zoning changes and amendments to other legislation, including, but not limited to, the City Local Waterfront Redevelopment Plan ("LWRP"), the City and either Developer or an entity to be designated by Developer and meeting the requirements for an assignment or transfer under

6

Final Execution Copy
June 20, 2007 (11:15 am)

Section 12.18 of this Agreement (said entity that executes the LADA, be it Developer or an entity designated by Developer, is referred to herein as "Purchaser"), shall execute a LADA for the Project. The LADA shall be consistent with the terms and conditions of this Agreement and any relevant planning and design modifications, including, but not limited to, any modifications to the Conceptual Plan or any environmental mitigation measures resulting from the environmental review processes under SEQRA, or any other applicable governmental regulations. The LADA shall further set forth, among other provisions, (i) the final purchase price to be paid by for the respective Project Parcels, in accordance Article V below, and more definitive legal descriptions of the Project Parcels; (ii) the specific terms and conditions for the transfers and/or plan of acquisition and transfer of the respective Project Parcels to the Purchaser; and (iii) responsibility for and cost of any Infrastructure, as described below in Section 2.5, required to be provided for the Project. The Developer and the City shall use their commercially reasonable best efforts to negotiate the LADA for the Project as soon as is practicable, subject to the terms and conditions herein, provided, that no LADA may be executed until the Developer and the City comply with all applicable laws and regulations, including, but not limited to, SEQRA. The LADA shall be subject to approval by the City Council, such approval not to be unreasonably withheld or delayed.

2.2    Assemblage of the Proposed Project Parcels

(a)    The parties intend that fee simple title in an to the City Property shall be sold and conveyed to the Purchaser in accordance with the LADA for a purchase price determined in accordance with Section 5.1 below, subject to all conditions and limitations set forth in this Agreement. Prior to entering into the LADA, the City shall take whatever actions are necessary to ensure that fee simple title to all City Property owned by other entities shall be conveyed to Purchaser in accordance with the LADA.

(b)    To the extent that the Project involves real property not owned by the City as of the date of this Agreement, acquiring said property and/or obtaining site access or site control agreements shall be the responsibility of the Developer, except that the City shall be responsible for acquiring any real property for which condemnation is necessary as provided below, but only as a last resort (i.e., if Developer or Purchaser is unable, after a good faith effort, to consensually acquire same).

(c)    In the event that the Developer is unable, after a good faith effort, to consensually acquire the Non-City Property identified in Schedule A, which is part of the Project Area, then, at the request of the Developer and subject to all applicable State and local laws, the City shall commence use of eminent domain, and thereafter shall diligently pursue all actions and procedures required under the New York Eminent Domain Procedure Law ("EDPL") in a good faith effort to accomplish such condemnation as expeditiously as possible. If privately owned property (in addition to the Non-City Property identified in Schedule A) is desired to be added to the Project Area by the parties, and Developer is unable, after a good faith effort, to consensually acquire said additional private property, then at the request of Developer and subject to all applicable State and local laws, the City shall consider commencing, on a case by

7

**Final Execution Copy**
**June 20, 2007 (11:15 am)**

case basis, use of eminent domain in the same manner as is provided above for the Non-City Property. The parties agree that the Developer may obtain or assist the City to obtain Public Funding (as herein below defined) to defray, or reimburse the Developer for Condemnation Costs incurred by the Developer hereunder, and the City will support such efforts to obtain Public Funding for such purpose.

        2.3    Urban Renewal Plans. The City hereby agrees to amend any existing Urban Renewal Plan affecting the Project Area, as reasonably requested by Developer, to facilitate the Project and so that any such Urban Renewal Plan is not an impediment to the Project.

        2.4    [intentionally blank]

        2.5    Infrastructure.

        (a)    Project Infrastructure. As used in this Agreement, the term Project Infrastructure shall be deemed to refer to all infrastructure improvements directly related to or necessary for the development or enhancement of the Project (other than Public Infrastructure and Shared Infrastructure, as described below in clauses (b) and (c) of this Section 2.5), whether publicly dedicated or not, and whether or not situated within the Project Area, including, but not limited to, streets, roads, curbs, sanitary sewer hook-ups, domestic water tap-ins, storm water drainage facilities, gas, electric, communications and other utility improvements and installations, and private residential parking facilities required as part of the Project. The LADA shall provide that Purchaser (i) shall be responsible for funding and carrying out the design, engineering and construction, and obtaining financing and all approvals from other governmental entities that may be required therefor and (ii) shall oversee, or engage the services of a general contractor or construction manager who shall oversee, and shall be responsible for the construction and installation of the Project Infrastructure, subject to applicable laws and governmental procurement policies. The City shall support, assist and cooperate with the Purchaser in its performance of such responsibilities, it being the intention of the parties to this Agreement to establish a collaborative working relationship in furtherance of the Project Infrastructure development program. To the extent permitted by law, the City shall use best efforts, in consultation and cooperation with the Developer and Purchaser, to pursue all available Federal, State and other governmental and public grants and/or subsidies ("Public Funding") in connection with the construction of the Project Infrastructure. At Developer's or Purchaser's request, the City shall also use its best efforts to use municipal financing mechanisms for the Project Infrastructure, including, without limitation, the establishment of special taxing districts and the issuance of municipal bonds ("Municipal Financing"), provided, that the use of Municipal Financing for Project Infrastructure specifically, is limited to those uses that are revenue neutral for the City, meaning that such use would in no way reduce the amount of revenue to the City's general budget, and would not unduly strain the City's bonding capacity, as determined in the reasonable discretion of the City Manager.

        (b)    Public Infrastructure. As used in this Agreement, the term "Public

8

Final Execution Copy
June 20, 2007 (11:15 am)

Infrastructure" shall be deemed to refer to all governmental and utility improvements, perhaps related to the Project, but substantially benefiting the public or areas beyond the Project Area, or necessary to correct pre-existing capacity or other deficiencies not solely related to the Project, whether or not situated within the Project Area or Contiguous Areas. Public Infrastructure, for purposes of the Project, shall include, among others, the relocation and upgrade of the existing sewer interceptor and utilities so that they are located in rights of way adjacent to the Project Area (the "Sewer/Utility Relocation and Upgrade Cost"), construction of a landscaped median and traffic calming improvements along lower Broadway, construction of public parking facilities (which shall be deemed to include parking facilities serving retail uses within the Project), and construction of upgrades to the City sewer treatment plant, to the extent required to service the Project. The City shall be responsible for funding and financing such Public Infrastructure and all Public Infrastructure Costs (as defined hereinafter). The Developer, to the extent permitted by law and in consultation with the City and its relevant specifications and standards, and for reasonable and customary fees to be paid by the City (i) shall be responsible for carrying out the design, engineering, and construction, of the Public Infrastructure, and for obtaining all approvals from other governmental entities that may be required therefore, (ii) shall take the lead in preparing, submitting and pursuing applications for Public Funding (as herein below defined) for the Public Infrastructure, and (iii) shall oversee, or select a general contractor or construction manager who shall oversee and shall be responsible for the construction and installation of the Public Infrastructure, subject to applicable laws and governmental procurement policies. The City agrees to cooperate with Developer in obtaining any approvals for Public Infrastructure, including, but not limited to, executing permit applications to agencies with jurisdiction to approve. The activities described in clauses (i), (ii) and (iii) in the preceding sentence are sometimes herein below referred to collectively as "Public Infrastructure Work." The costs incurred or to be incurred for the design, engineering, survey, construction, construction management, permits and inspections, and related insurance costs, are collectively referred to in this Agreement as "Public Infrastructure Costs." Notwithstanding anything to the contrary set forth above in this Section 2.5(b), the Developer or Purchaser may at its sole discretion (i) elect to undertake or complete the design, engineering or construction of extraordinary improvements or repairs to Infrastructure in order to expedite such design, engineering or construction work; and/or (ii) at its further election at its sole discretion, to advance its own private funds in order to expedite such work ("Public Infrastructure Advances"). Public Infrastructure Advances shall be recouped by Developer by reimbursement from Public Funding or Municipal Financing in accordance with Section 2.5(e), and the City shall use all reasonable best efforts to reimburse Developer for such Public Infrastructure Advances as soon as possible. In the event such reimbursement can not be made, Developer shall also have the right to recoup same as an offset against the Purchase Price for the City Property to be acquired pursuant to the LADA.

(c)    Shared Infrastructure. The parties recognize that certain infrastructure required for the Project will be shared by and benefit the public, as well as the private owners and/or tenants within the Project ("Shared Infrastructure"). Shared Infrastructure includes, but is not limited to, public open space, parks, bulkhead improvements, and parking facilities serving commercial uses such as office and hotel uses. The City and the Developer shall use their

Final Execution Copy
June 20, 2007 (11:15 am)

reasonable best efforts to obtain Public Funding to pay for the Shared Infrastructure. In the event sufficient Public Funding is not available for all or a portion of the Shared Infrastructure, the costs associated with Shared Infrastructure may be funded by one or more of the following sources or a combination of such sources: Public Funding, Municipal Financing, Developer funding and/or City funding.    The parties shall endeavor in good faith to arrive at a fair and reasonable allocation of responsibility for the financing of such Shared Infrastructure during the period prior to the execution of the LADA hereunder based upon the preparation by the Developer and the City's receipt and review of detailed financial pro-formas, more detailed information on such Shared Infrastructure to be produced and analyzed during the SEQRA and other governmental review processes, and other information reasonably required or produced by the parties. The parties also reserve the right, upon mutual agreement, to reduce the scope of the Shared Infrastructure, if adequate funding therefor is ultimately not available and they believe such reduction in scope is necessary in order to advance the Project. In the event that the parties cannot agree to mutually acceptable funding mechanisms for one or more elements of the Shared Infrastructure, then the parties shall submit to binding arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association, provided, that the parties first engage in mediation to resolve any dispute, the procedures of which shall be mutually agreed to in the LADA.

(d)    Except as may be applicable under paragraph (e) below, and at the City's option, the Developer shall construct any public parking lot or public parking structure included in Public Infrastructure (a "Public Parking Facility") and shall receive reasonable fees for doing so, whereas the City shall be responsible for funding and financing such Public Parking Facilities. The City shall operate any such Public Parking Facility. The Developer or Purchaser and the City shall negotiate, at the time of the execution and delivery of a LADA, responsibility for funding annually any operating deficits that may be incurred in the course of operation of any such Public Parking Facility, with the understanding that such funding may be covered by an operation deficit reserve included in the financing for such Public Parking Facility; provided, however, that in no event shall the Developer or Purchaser be responsible for funding any portion of such deficit attributable to replacement reserves or depreciation.    At the time of execution and delivery of a LADA for the Project that is to be served by a particular Public Parking Facility, the Purchaser and the City shall also enter into an additional agreement or agreements containing terms and conditions, mutually acceptable to the parties thereto, pertaining to parking rates, budgeting of operating costs, standards of operation, permit parking, and other matters pertaining to the management and operation of such Public Parking Facility.

(e)    At the Developer's option, and to the extent permitted by law, the Developer may propose that any Public Parking Facility be developed and constructed on a design/build basis, with participation by a local development corporation created under Section 1411 of the Not-for-Profit Corporation Law (an "LDC"), which may (i) own such Facility, or become the lessee or sublessee thereof; (ii) contract with the Developer for the latter to design, construct and operate such Facility, and (iii) receive from one or more municipal entities, and use for the payment of Public Infrastructure Costs, the following: (A) Public Funding, (B) Municipal Financing, (C) the proceeds of other bonds or notes that may be issued by the City or other

10

municipal entity to cover the Public Infrastructure Costs of such Facility, (D) contributions made by the City pursuant to paragraph (b) above in this Section, (E) advances that may be made by the Developer at the Developer's option, and (F) such other funds as the parties to this Agreement may provide for payment of the Public Infrastructure Costs of such Parking Facility. If the Developer shall propose to proceed on a design/build basis for any Public Parking Structure, then the City and any other participating municipal entity shall cooperate with the Developer diligently and in good faith, in accordance with applicable law, in order to implement such proposal. At the time of execution and delivery of a LADA for the Project that is to be served by a particular Public Parking Facility, the Developer and the City or other applicable municipal entity shall also enter into an additional agreement or agreements containing terms and conditions, mutually acceptable to the parties thereto, pertaining to parking rates, budgeting of operating costs, standards of operation, permit parking and other matters pertaining to the management and operation of such Public Parking Facility.

(f)     The parties to this Agreement acknowledge that although funding commitments may hereafter be obtained from Federal, State or County sources of Public Funding, or from municipal entities, including the City, committing to provide Municipal Financing for elements of Public Infrastructure Work, the actual funding of such assistance may be delayed beyond the scheduled time for commencement of such Public Infrastructure Work. In such event the Developer may at its sole discretion, in order to expedite such Public Infrastructure Work, elect to advance its own funds to pay Public Infrastructure Costs of such Work, and the Developer shall be entitled to be reimbursed by the City or other appropriate municipal entity, as and to the extent permitted by law, in the amount of such advance(s), from proceeds of Public Funding or Municipal Financing subsequently received by the City (or by such other municipal entity) for the Public Infrastructure Work that was the subject of the Developer's advance.

(g)     At the earliest possible date following execution of this Agreement, the Developer shall provide the City with financial pro forma information relevant to implementation and construction of the Project, which shall be sufficiently detailed for the City to make informed decisions regarding the Project, including the financing of Public, Private and Shared Infrastructure. The City reserves the right to request a reasonable level of additional financial information from the Developer in the event that it determines that additional information is necessary in order for it to make such decisions in connection with the Project.

(h)     Notwithstanding anything in this Section 2.5 herein to the contrary, the application for and use of Public Funding shall be prioritized in the following order: Public Infrastructure, Shared Infrastructure and Project Infrastructure, unless the City and Developer mutually agree to change such priority order.

2.6     [intentionally blank]

2.7     Seeking County, State, Federal Assistance. Either party, in consultation with the other, may invite the Empire State Development Corporation and/or a subsidiary of Empire State Development Corporation ("ESDC"), as well as any other State Agencies, Federal

11

# EXHIBIT A

**(Part 3 of 3)**

**Final Execution Copy**
**June 20, 2007 (11:15 am)**

agencies and the County of Orange, where appropriate, to assist in the study and funding of various components of the Project.

2.8 [intentionally blank]

2.9 <u>Changes to Reflect SEQRA Findings</u>. The City agrees to act reasonably in connection with all procedures and actions taken pursuant to SEQRA hereunder. The parties acknowledge, however, that the SEQRA findings to be made by the City and other municipal entities may require the Project, or portions thereof, and the Conceptual Development Plan, to be modified, reduced in scope or rejected, in whole or in part. If the Developer, in its sole judgment and discretion, determines that such modification, reduction or rejection is consistent with the Developer's continued participation in the redevelopment of the Project affected by such SEQRA findings, then all relevant documents, including, without limitation, this Agreement, the Conceptual Plan, the conceptual plan for a Contiguous Project and any LADA, shall be modified to reflect such SEQRA findings, if any. If the Developer, in its sole judgment and discretion, determines that such modification, reduction or rejection is not consistent with the Developer's continued participation in the redevelopment of any portion of the Project affected by such SEQRA findings, then the Developer shall have the right to withdraw its development proposal(s) with respect to the Project, and in the event of such withdrawal and subject to the provisions and requirements of Articles IX and X below, (i) the Developer shall promptly reimburse to the City any funds owed to it by the Developer under this Agreement, including, but not limited to, costs incurred in any condemnation proceeding; (ii) Developer shall have no claim of right to any monies that have been paid to the City; (iii) the City shall have no further obligation to the Developer, and (iv) all plans, studies and reports of any kind previously submitted to the City in connection with the Project shall remain the property of the City.

## ARTICLE III

## ENVIRONMENTAL REQUIREMENTS

3.1 <u>Brownfield Application – Access Agreement</u>.

(a) Subject to this Agreement being approved and executed by the City, the Developer or Purchaser may, at any time, if applicable, and if permitted by the New York State Department of Environmental Conservation ("DEC"), submit an application to the DEC to undertake environmental remediation of all or part of any parcel within the Project Area, as a "volunteer" under the New York State Brownfield Cleanup Program ("BCP"), and the City shall support any such application, including by way of partly sponsoring same. Any related environmental investigation and remediation, undertaken pursuant to the Brownfield Application shall be at the sole cost and expense of the Developer or Purchaser. If the Developer or Purchaser enters the BCP, it shall also secure an environmental insurance policy, which protects all the parties to this Agreement from future environmental liability and that qualifies for the BCP Environmental Remediation Insurance Credit. The City shall be named as an additional

12

**Final Execution Copy**
**June 20, 2007 (11:15 am)**

insured.

(b)    Prior to Purchaser's acquisition of a parcel in the Project Area, the City shall provide Developer with access to the Project Area during reasonable hours, to the extent permissible by law, for the purpose of facilitating the terms and conditions herein, subject to the following conditions: (i) Developer shall provide the City with reasonable notice in advance of any testing thereon; (ii) the City approves in advance any testing protocol, such approval not to be unreasonably withheld or delayed; (iii) Developer uses commercially reasonable efforts to minimize any damage to or disturbance of the Project Parcels or any ongoing operations, businesses or events related thereto; (iv) Developer uses commercially reasonable efforts to restore the Project Parcels to their prior condition; (v) Developer obtains comprehensive liability insurance, naming the City as an additional insured party; and (vi) Developer indemnifies and holds the City harmless from and against any cause of action arising out of the Developer's access and/or use of any Project Parcel or parcels within a Contiguous Area contemplated to be a Project Parcel. Developer shall provide the City with copies of all test results, reports, data, documents and like materials prepared by Developer and/or its professional consultants concerning the Project Site.

3.2    Remedial Work Indemnification.

(a)    Developer and the City acknowledge that the Project Area includes the former Consolidated Iron & Metal site, which has been listed as a National Priorities List Site (referred to herein as the "NPL Project Area" or the "Consolidated Iron Site") by the United States Environmental Protection Agency ("USEPA") under CERCLA, and that the City has been identified by the USEPA as a potentially responsible party ("PRP") for response costs at the NPL Project Area. The City disputes its liability, and is seeking to settle any potential liability it may have with the USEPA. In connection with any settlement to be made by the City, the City agrees to use its best efforts to obtain successor liability and/or contribution protection in favor of the Developer, and Developer agrees to cooperate reasonably with the City so as not to hinder any settlement efforts, including, but not limited to, making such project modifications to the Concept Plan as may assist in reducing the City's potential liability, so long as such modifications do not, in the Developer's reasonable judgment, impair the quality of the Project.

(b)    Neither Developer nor Purchaser shall have any liability, pre-Closing or pre-delisting of the NPL Project Area from the National Priorities List, of any kind in the NPL Project Area.  Purchaser shall have no liability to the City for contribution, share none of the City's PRP liability, if any, and shall have no liability for remediation or removal of any existing environmental contamination in the NPL Project Area ("Remediation") until the later of (i) Purchaser takes title to the NPL Project Area and (ii) the Remediation conducted by the United States, the State and/or third party PRPs for the NPL Project Area is completed, and the Area is formally delisted from the National Priorities List ("Purchaser Liability Date"). Purchaser shall also have no liability resulting from any "re-opener provisions" set forth in any EPA order, settlement or other administrative directive.  Given that Purchaser, and not Developer, will be entering into the LADA, Developer shall have no liability whatsoever to the City with respect to

13

Final Execution Copy
June 20, 2007 (11:15 am)

the NPL Project Area or any other portion of the Project Area after the City and Purchaser enter into the LADA.

(c)     The LADA shall provide that Purchaser shall be liable for and indemnify, defend by legal counsel selected and retained by the City, and hold harmless the City and their successors and assigns, each of their employees, officials, members, agents or contractors, (the "Indemnitees"), from and against any Environmental Damages ("Indemnified Claims") (i) discovered or arising on or after the date of closing of title under the LADA (the "Closing Date") related to the non-NPL Project Area (as defined below, in Section 3.2(d)), and (ii) discovered or arising Post-Purchaser Liability Date in the NPL Project Area, provided that with respect to this clause (ii), (A) such Environmental Damages are not part of a re-opener provision in a EPA consent order, settlement document or administrative directive, (B) that although the parties shall covenant not to sue one another with respect to such Environmental Damages, neither party shall indemnify the other hereunder, except as provided below, and (C) Purchaser shall have no obligation hereunder to the City with respect to any claim by a third-party against the City, whether pre- or post-Purchaser Liability Date. Developer and Purchaser shall each be liable for and indemnify, defend by legal counsel selected and retained by the City, and hold harmless the Indemnitees from and against any Indemnified Claims caused by such indemnifying party (i.e., Developer or Purchaser, as the case may be), or in connection with existing and ongoing releases that are exacerbated by such indemnifying party on either the non-NPL Project Area or NPL Project Area, prior to or after the Closing. It is understood that Developer shall have liability for Indemnified Claims caused by Developer and releases exacerbated by Developer, but shall have no liability for Indemnified Claims caused by Purchaser or releases exacerbated by Purchaser; similarly, Purchaser shall have liability for Indemnified Claims caused by Purchaser and releases exacerbated by Purchaser, but shall have no liability for Indemnified Claims caused by Developer or releases exacerbated by Developer.

(d)     "Environmental Damages" means (i) all claims, judgments, damages, losses, penalties, fines, liabilities (including strict liability), encumbrances, liens, costs and expenses of investigation and defense of any claim, whether or not such claim is ultimately defeated, and of any settlement or judgment, of whatever kind or nature, contingent or otherwise, foreseeable or unforeseeable, relating to Hazardous Materials, (ii) reasonable third party out-of-pocket fees incurred for the services of attorneys, consultants, contractors, experts, and laboratories relating to Hazardous Materials, (iii) all other third party out-of-pocket costs incurred in connection with Hazardous Materials, including, without limitation, the cost of any work performed and materials furnished in order to comply with any environmental law, whether or not such cost is disclosed by any environmental report, including, without limitation, the cost of assessment, containment and/or removal of any and all Hazardous Materials, the cost of any actions taken in response to the presence, release or threat of release of any Hazardous Materials (iv) property damage (real or personal) arising out of or relating to any such Hazardous Materials, (v) damages arising from any violation of the provisions, covenants, representations or warranties hereof or of any legal requirements related to any such Hazardous Materials, and/or (vi) cleanup or remediation expenses, claims, demands, penalties, fees, fines, liabilities, settlements, damages, losses, costs or other reasonable expenses of whatever kind or nature,

14

Final Execution Copy
June 20, 2007 (11:15 am)

known or unknown, contingent or otherwise, whether incurred or imposed within or outside the judicial process, including, without limitation, reasonable attorneys' fees and consultants' fees and disbursements and investigations and laboratory fees, related to any and all Hazardous Materials, but only to the extent any such matter described in the foregoing clauses (i) through (vi) arise out of (A) the presence, disposal, escape, seepage, leakage, spillage, discharge, emission, release or threat of release of any Hazardous Materials (as hereinafter defined) in, on, over, under, or affecting the NPL Project Area, or any part thereof, whether or not disclosed by any environmental report relative to the NPL Project Area, but excluding any migratory contamination from the NPL Project area in, on, or to land outside the Project Area, (B) the presence, disposal, escape, seepage, spillage, discharge, emission, release or threat of release of any Hazardous Materials on the City Property, excluding the NPL Project Area (the City Property, other than the NPL Project Area, being referred to herein as the "non-NPL Project Area"), or any part thereof whether or not disclosed by any environmental report relative to the Project Area, provided, however, as to clause (A) above and this clause (B), in the event that Developer discovers Hazardous Materials on either the non-City Property or Boat Launch Property, either pre or post-Closing, which Developer reasonably establishes migrated from the NPL Project Area, the parties agree to negotiate in good faith and include in the LADA, who is responsible for any Remedial Work (defined hereinafter) on said Properties, as well as allocation of liability for such contamination, and in failing agreement thereon, such responsibility and allocation shall be determined by binding arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association, provided that the parties first engage in mediation to resolve any dispute. Notwithstanding, the foregoing, and for avoidance of doubt. "Environmental Damages" shall not include any damages, losses, or claims of any kind related to or arising from any personal injury (including without limitation wrongful death, disease or other health condition related to or caused by, in whole or in part, by any Hazardous Materials).

(e)    "Hazardous Materials" means and includes (i) those elements, wastes, materials, substances or compounds identified or regulated as hazardous or toxic pursuant to the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (42 U.S.C. § 9601 et seq. and 40 CFR § 302.1 et seq.) ("CERCLA"), the Resource Conservation and Recovery Act of 1976 (42 U.S.C. § 6901 et seq.), the Federal Water Pollution Control Act (33 U.S.C. § 1251 et seq. and 40 CFR § 116.1 et seq.), the Hazardous Materials Transportation Act (49 U.S.C. § 1801 et seq.), the Clean Air Act (42 U.S.C. § 7401 et seq.), the Federal Insecticide, Fungicide and Rodenticide Act (7 U.S.C. § 136 et seq.), the Emergency Planning and Community Right to Know Act (42 U.S.C. § 1101 et seq.), the Occupational Safety and Health Act (29 U.S.C. § 651 et seq.), the Residential Lead Based Paint Hazard Reduction Act (42 U.S.C. § 4851 et seq.), the New York State Navigation Law, all applicable or analogous state laws, any amendments thereto, and the regulations promulgated pursuant to said laws, all as amended from time to time, relating to or affecting the Project Area, (ii) any hazardous, toxic or harmful substances, wastes, materials, pollutants or contaminants including, without limitation, asbestos, polychlorinated biphenyls, petroleum products, flammable explosives, radioactive materials, infectious substances, materials containing paint or raw materials (which include hazardous constituents) or any other substances or materials which are identified by or regulated by any Environmental Laws, on, in, under or affecting all or any portion of the Project Area, and

15

**Final Execution Copy**
**June 20, 2007 (11:15 am)**

(iii) any substances now or hereafter defined as or included in the definitions of "hazardous substances", "hazardous wastes", "hazardous materials", "pollutants", or "toxic substances" under any applicable Environmental Law.

      3.3    Developer's Remedial Work.

      (a)    The LADA shall provide that the Purchaser shall promptly perform (subject to Section 3.5 below) any and all necessary remedial work required by law in order to address Hazardous Materials ("Remedial Work") affecting the non-NPL Project Area. Purchaser shall also be responsible for any Remedial Work on-site in the NPL Project Area, post-Remediation and upon delisting of the Area as an NPL site hereunder, provided, Purchaser shall receive credits against the Purchase Price for such Remedial Work as set forth in Section 3.7 herein, except in the event that Developer or Purchaser caused or exacerbated such Environmental Condition or Hazardous Materials. The Remedial Work shall be performed in a diligent and timely fashion by licensed contractors acting under the supervision of a consulting environmental engineer, and with such insurance coverage pertaining to liabilities arising out of the Remedial Work as is then customarily maintained with respect to such activities. Purchaser shall provide written notice at least fifteen (15) days in advance of the selection of an environmental engineer to perform such services. Purchaser shall also provide the City written notice at least fifteen (15) business days before the commencement of Remedial Work of the names of the contractors selected to perform such Remedial Work, and provide to the City copies of the contracts and other documents entered into with such parties. In addition, Purchaser shall submit to the City promptly upon receipt or preparation thereof, copies of any and all reports, studies, analyses, correspondence, governmental comments or approvals and similar information in connection with any Remedial Work. Any reports to be delivered to the New York State Department of Environmental Conservation ("NYSDEC") with respect to the Remedial Work must be reviewed and approved by the City prior to submission, which approvals shall not be unreasonably withheld or delayed.

      (b)    It shall be Purchaser's obligation under the LADA to furnish the City's environmental consultant with all invoices, progress reports, plans, and other documents reasonably sufficient to assure the Environmental Consultant that all Remedial Work has been accomplished.

      (c)    Purchaser shall be liable for the costs (the "Remediation Costs") of performing all Remedial Work for which Purchaser is responsible under the LADA, subject to Section 3.7 below.

      3.4    Defense of Claims.    If any suit, proceeding, claim or demand is brought or made against the City with respect to Environmental Conditions at the Project Area for which Developer or Purchaser is liable under Section 3.2(c) hereunder, such indemnifying party may elect: (i) to undertake the defense thereof in cooperation with the City and, provided counsel to the indemnifying party is reasonably acceptable to the City, at such indemnifying party's

16

Final Execution Copy
June 20, 2007 (11:15 am)

expense; or (ii) to notify the City to undertake the defense thereof with counsel as may be mutually acceptable to the parties hereto. If the indemnifying party notifies the City to undertake the defense, the City shall undertake the defense at such indemnifying party's expense, said reasonable payments to be made on a monthly basis; and in such case, the indemnifying party may at its option join in the defense, but at its own expense, and the City would control the defense. The parties agree that the indemnifying party shall have the right to compromise or settle any suit or claim in which the City or its Indemnities are named only if such settlement shall result in a full and final release of all claims against the City or its respective Indemnities. In the event of a settlement, the indemnifying party shall remain liable to the City for all reasonable costs of defense that have been incurred by the City.

        3.5    Environmental Studies; Option to Withdraw Proposal. Following the execution of this Agreement, during the period in which the Developer is preparing a draft environmental impact statement (a "DEIS") as contemplated herein, the Developer shall engage an environmental consultant to perform a Phase I environmental evaluation of the non-NPL Project Area, and shall do so from time to time thereafter with respect to each Contiguous Area following its approval by the City Council as herein provided, and during the period of preparation of a DEIS or DGEIS for such Contiguous Area. With respect to the non-NPL Project Area, or any Contiguous Area for which the Phase I report reveals a need, in the Developer's reasonable judgment, for a Phase II environmental site investigation, the Developer may cause to be prepared a Phase II report of the results of such site investigation. Copies of all Phase I and Phase II environmental reports obtained by the Developer, as hereinabove described, shall be furnished to the City and their respective environmental consultants for their approval of the Phase II protocols, said approval shall not be unreasonably withheld or delayed. If on the basis of any such Phase I or Phase II environmental report for any parcel(s) within the Project Area or a Contiguous Area, as the case may be, the Developer decides not to proceed with the development of such Project Area, the Developer may elect, at any time and in its sole and absolute discretion, by written notice to the City, to withdraw its proposal for redevelopment of such parcel, whereupon the terms and conditions of this Agreement pertaining to the redevelopment of such parcel, including without limitation the approval and execution of a LADA therefor, shall be of no force and effect, provided, that the Developer shall remain liable with respect to its obligations under (i) Section 3.1(b), relating to any work Developer may have performed in such portion of the Project Area, and (ii) Section 10.2, relating to reimbursement of costs incurred by the City with respect to such portion of the Project Area.

        3.6    Tax Credits. Developer or Purchaser may, in consultation with the City, apply to the New York State Department of Environmental Conservation for assistance and benefits (including Brownfield Tax credits and other legal and financial benefits) under the New York State Brownfields Cleanup Program, in connection with Environmental Conditions affecting any Project Area or Contiguous Project Areas, and the City shall cooperate with the Developer and Purchaser in support of any such application.

        3.7    Remediation Off-Set. The City shall provide an off-set to the Purchase

17

Final Execution Copy
June 20, 2007 (11:15 am)

Price for costs incurred prior to or after Closing due to the presence of Hazardous Material on each and every City Property, where such condition exists, in the amount of 100% of such documented costs up to the total Escalated Purchase Price (hereinafter defined) of such Project Parcel, provided, however, that no such off-set shall apply with respect to (A) any costs reimbursed by the Brownfield Program or other Public Funding or other similar program, to the extent that such amounts reimbursed are in excess of the legal and other consulting fees, and all other costs associated with obtaining such reimbursement, or (B) any costs associated with construction activities not exclusively associated with remediation, including: (i) any environmental testing or investigation undertaken by the Developer or Purchaser in connection with its due diligence or subsequent construction activities, as opposed to investigation, testing and specialized construction activities with respect to prior identified contaminated conditions, which would result in an offset; (ii) any investigation, testing, or consulting expenses incurred by the Developer or Purchaser required in connection with a BCP application; (iii) any demolition activities or removal of asbestos from demolished structures; (iv) any removal of underground storage tanks or excavation of non-contaminated soil, as opposed to costs associated with remediation of petroleum, contaminated soil or other hazardous materials associated with such storage tanks, for which there shall be an offset; (v) any grading, site preparation or other design-driven concerns; and (vi) any Environmental Damages arising from or related to Environmental Conditions caused or resulting from the actions of the Developer or Purchaser or their agents, contractors, subcontractors, invitees, licensees, permittees or subtenants which gives rise to liability under any Environmental law. For clarification purposes, except as otherwise provided herein, Purchaser shall be entitled to remediation offsets under this paragraph for those costs identified prior to or after Closing, which would increase the cost of construction or ownership and are anticipated to be incurred due to the presence of potential or continuing Hazardous Materials on the Project Parcels that existed prior to conveyance to Purchaser, including, without limitation, costs of monitoring an environmental condition and incremental construction costs resulting from deed restrictions, institutional or engineering controls on the Project Parcels. In the event that the parties cannot agree on the amount of offset for any Project Parcel, such costs shall be determined by arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association, provided, that the parties first engage in mediation to resolve any dispute. If any individual Project Parcel has a purchase price of less than zero after applying all applicable offsets, Purchaser shall receive a credit for the negative value of such property, to be applied against the purchase price of the Project Parcels with a positive value, provided, however, that no credit shall become payable against any individual Project Parcel until such Project Parcel is conveyed to the Purchaser. It is anticipated that the parties will agree on an appropriate escrow or other mechanism to secure the Purchaser's rights to receive such offsets following the Closing.

       3.8   Purchase of Project Area Parcels. Purchaser shall have the right to refuse to take title to all or part of the Project Area if the Remediation of the NPL Project Area is not adequate or if the Developer determines that the required remediation of any other Project Parcel is not acceptable, if it creates risks unacceptable to the Purchaser, or if the Purchaser and Developer cannot obtain adequate protection against potential environmental liability to third parties, in all cases, in the reasonable discretion of the Purchaser and Developer.

18

**Final Execution Copy**
**June 20, 2007 (11:15 am)**

3.9    Non-City-Property.    Developer and the City agree that the Non-City-Property is not part of the NPL Project Area or the non-NPL Project Area. The parties agree that the Developer may conduct Phase I and Phase II environmental site assessments of such property prior to the City's consensual acquisition or condemnation of the Non-City Property. The LADA shall provide that, should Purchasers purchase the Non-City-Property, Purchaser shall be liable for, and shall hold harmless the Indemnitees from and against, any liability under CERCLA relating to the City's interim ownership of the Non-City-Property, post-acquisition or condemnation. The LADA shall also provide that the Purchaser shall promptly perform any and all necessary remedial work on the Non-City-Property, with the exception of migratory contamination from the NPL Project Area, which shall be dealt with as set forth in Section 3.2(d)(ii).

## ARTICLE IV

## LAND USE REQUIREMENTS

4.1    Applications for Land Use Approvals.    The Developer at its sole cost and expense shall as soon as practicable following the execution of this Agreement, make application to the City Council, the Newburgh Planning Board (the "Planning Board") and/or the Newburgh Zoning Board of Appeals ("ZBA") or other governmental entity having approval authority under applicable State law or applicable City zoning, subdivision or other land development laws, rules and regulations, for any and all land use approvals necessary to accomplish the Project. The Developer shall diligently endeavor to meet all applicable timeframes set forth in Section 8.2. It is acknowledged and agreed that completed applications to the Planning Board and/or ZBA, or any other agency with jurisdiction over the Project for subdivision, site plan, special permit, variances or any other site specific related permit or approval, cannot be fully made until the City enacts any applicable zoning changes related to the Project.

4.2    Environmental Quality Review.    The Developer shall, at its sole cost and expense, also undertake all studies and applications required in order for the City to comply with SEQRA and to pursue any other applicable land use proceedings with respect to the Project. The City shall fully cooperate with and diligently assist the Developer and its consultants in furtherance of the studies, applications and proceedings for which the Developer is responsible under this Section 4.2, it being understood and agreed that such cooperation and assistance shall include, but shall not be limited to, the facilitating of interviews and on-going consultations with the City and other governmental officials and the prompt dissemination of information (including technical and statistical data), as the Developer and/or its consultants may request from time to time. The parties acknowledge that the Conceptual Plan for the Project Area described herein is intended to provide a basis for further planning, for meaningful environmental review and for the negotiation of a LADA, and cannot be considered definitive prior to, and may undergo significant revision and renegotiation on the basis of many factors, including environmental findings (including possible mitigation measures) hereafter made by a designated lead agency as

19

Final Execution Copy
June 20, 2007 (11:15 am)

part of the SEQRA process.  The Developer acknowledges that (i) the City has not undertaken any commitment to approve or implement the Conceptual Plan or any Project described therein, and that no such commitment shall exist unless and until the SEQRA process is concluded in a manner favorable to such Plan as it may be revised; and (ii) a LADA will not be approved by the City Council unless and until all procedures prerequisite thereto under applicable law have been completed and unless and until such SEQRA procedures have been completed as aforesaid. The City intends to designate the City Council as lead agency with respect to the SEQRA process hereunder.

4.3  LWRP and Zoning Code Revisions.  The City and Developer acknowledge that the Project must comply with the City's Local Waterfront Revitalization Plan and the City's Zoning Code in effect when the Project is approved.  Nothing herein shall be deemed a waiver of the City's right to enforce amendments to the Zoning Code after Project approval, in the event that the Developer has not taken necessary action to obtain vested rights in the Project or extend its Project approvals, provided that the City has not unlawfully prevented or unreasonably delayed Developer's ability to obtain such vested rights.

## ARTICLE V

## PROPERTY ACQUISITION AND DISPOSITION COSTS

5.1    City Property Acquisition Costs. Subject to the execution of the LADA and the completion of all obligations hereunder, the City shall convey to the Purchaser at Closing the fee simple title in and to the City Property in accordance with the following Purchase Prices established through various Appraisal Reports prepared for the City and the Developer, (i) the Project Parcels consisting of the Consolidated Iron Site, shall total $1,933,000.00, and (ii) the balance of the City Property (other than the Boat Launch Parcel), also as identified in Schedule A, shall total $2,061,800.00 ("Base Purchase Prices").  In the LADA, the parties shall allocate the Base Purchase Prices among the Project Parcels in a reasonable manner, based upon Appraisal Reports referred to above, such allocation to be utilized in the event the Project Parcels are acquired in phases under the LADA.  It is noted that the parties have not yet determined the Base Purchase Price applicable to the Boat Launch Parcel. Said Purchase Price shall be determined in the same manner as the parties utilized to determine the Base Purchase Prices set forth herein (pursuant to the Exclusivity and Planning Agreement), but also taking into account the terms of the Co-operative Agreement.  The Base Purchase Prices shall be increased by 50% of annual CPI appreciation for the period commencing on February 1, 2009, and ending upon the Closing Date, minus any setoffs set forth in Section 3.7 above, or in conjunction with any Public Infrastructure Advances as set forth in Section 2.5(b) herein.  Another off-set includes the incremental increase in construction costs specifically due to the presence and/or removal of extraordinary debris or abandoned subsurface infrastructure within the Project Area, in connection with conditions not reasonably found in other similarly situated Hudson River waterfront property, such final amounts to be negotiated subject to the receipt and review of the Project financial and other information as set forth under Section 2.5(f).

20

**Final Execution Copy**
**June 20, 2007 (11:15 am)**

5.2    Acquisition Costs of Non-City Property.

(a)    With respect to real property (including rights of access to or control over real property) acquired by the Purchaser from owners other than the City as contemplated in Section 2.2 (b) and (c) above, the Purchaser shall be solely responsible for paying all costs of such acquisitions, including, but not limited to, the consideration to be paid for the parcel, subject to Purchaser's or Developer's approval of the consideration offered, which shall not be unreasonably withheld or delayed, and all survey, title insurance, legal and closing costs.

(b)    Prior to the Closing under the LADA for any non-City Properties, Purchaser shall advance, or provide assurance reasonably satisfactory to the City that it shall pay at Closing, all Acquisition Costs and Disposition Costs (as defined hereafter) for any non-City Properties to be acquired hereunder (said advance is referred to as "Developer Funding"). Anything in this Agreement to the contrary notwithstanding, the City shall not have any obligation to acquire any privately owned property or make any legally binding offer to acquire any privately owned property, whether under the EDPL or GML or through arms-length "private" negotiation, unless and until the Purchaser pays the Developer Funding for such property or provides such assurance of payment. On or before the date which is thirty (30) days prior to the date on which the City shall incur any amount of Acquisition Costs, Disposition Costs, or Relocation Costs (as hereinafter defined) approved by the Developer or Purchaser, and in all events at least thirty (30) days prior to the date of closing of transfer of title, the City shall invoice the Purchaser for such costs. Purchaser shall pay to the City in full all previously approved and invoiced Acquisition Costs, Disposition Costs, and Relocation Costs within the time frame set forth in the LADA.

(i)    "Acquisition Costs" means all third party out-of-pocket costs incurred or to be incurred by the City to acquire privately owned property pursuant to the EDPL, including, without limitation, all necessary and reasonable legal and other reasonable fees incurred by the City in defending any legal or administrative challenges to such acquisition, in bringing any legal actions to determine the value of the property pursuant to the EDPL, as well as reasonable appraisal fees, surveying costs, and title insurance charges.

(ii)    "Disposition Costs" means all third party out-of-pocket costs incurred or to be incurred by the City to dispose of the privately owned property, if necessary, and the City Property, and including, without limitation, all necessary and reasonable legal and other reasonable fees incurred by the City in effecting such disposition including defending any legal or administrative challenges to such disposition, as well as reasonable appraisal fees, consultant fees, surveying costs, and title insurance charges.

(c)    The Developer hereby acknowledges and agrees that as of the date of closing of transfer of title there may be outstanding claims for compensation for the property acquired pursuant hereto by the City under the EDPL. The Developer hereby acknowledges and agrees that the Acquisition Costs shall include any and all additional compensation under the

21

EDPL determined to be due to a property owner by the courts, or agreed to be due to a property owner under a settlement of such owner's claims (subject to the approval of the Developer, which approval shall not be unreasonably withheld or delayed) after the Closing (the "Post-Closing Consideration"). The Post-Closing Consideration shall also be deemed to include all third-party out-of-pocket fees and costs incurred by the City in the prosecution or defense of such actions under the EDPL and/or the negotiation of settlements thereof, said amounts to be expenses under Section 10.2 of this Agreement. To secure the payment by the Purchaser of the Post-Closing Consideration, Purchaser shall deliver to the City at the Closing a letter (or letters) of credit or, at Purchaser's discretion, a payment bond (or bonds) in favor of the City in form and substance reasonably acceptable to the City Corporation Counsel, in the amount of twenty percent (20%) of the aggregate of all "approved" offers formally made by the City to, but rejected by, the owners of the property acquired by the City in connection with the Project (the "Contested Offers"), less any advance payments made to those condemnees by the City, as of the date which is thirty (30) days prior to the Closing Date (the "EDPL Security"). Twenty (20) days prior to the Closing Date, the City shall deliver a written notice to Purchaser, which identifies with particularity the Contested Offers and calculates the amount of the EDPL Security for the Post-Closing Consideration yet to be paid in connection with the Project. The Developer agrees that throughout the pendency of any proceeding under Article 5 of the EDPL, the EDPL Security shall be maintained at the amount required hereunder. All Post-Closing Consideration shall be paid by the City from the EDPL Security; provided, however, that in the event that the amount of the EDPL Security is insufficient to pay the Post-Closing Consideration due and payable, then Purchaser shall be responsible for, and shall pay to the City any such deficiency within twenty (20) business days of a written demand therefor which is accompanied by either a copy of the judgment(s) of the court or of the settlement agreement(s) approved by the court with respect to all Contested Offers. Notwithstanding anything to the contrary in this Agreement, the amounts of all "approved" offers made by the City under the EDPL shall be based on appraisals made by a qualified appraiser, who shall be mutually acceptable to the City and the Developer.

(d)    With respect to all properties acquired from a private seller or condemnee, as contemplated hereunder, Purchaser shall be responsible for carrying out all necessary relocation activities, and shall bear all reasonable relocation costs payable to such seller or condemnee, and to its respective tenants, to the extent applicable and subject to all applicable laws, provided, that at Purchaser's request, the City shall cooperate in and assist, where the City deems appropriate in its reasonable discretion, for carrying out all or part of the relocation activities required in connection with the Project. Purchaser shall engage a relocation consultant reasonably satisfactory to the City to assist it in carrying out the relocation program, and Purchaser shall pay the fees and reimbursable expenses charged by the consultant for such service.

**Final Execution Copy**
**June 20, 2007 (11:15 am)**

## ARTICLE VII

### NON-BINDING EFFECT

The Developer acknowledges and agrees that this Agreement is not binding on the City until the City Council has approved this Agreement. THE DEVELOPER'S RIGHTS TO THE PROJECT DESCRIBED HEREIN SHALL BE LIMITED TO THE RIGHTS EXPRESSLY SET FORTH HEREIN.

## ARTICLE VIII

### CONSULTATION/MILESTONES/TERM

8.1    Consultation.  It is the intent of the parties that during the term of this Agreement, representatives of the Developer and the City shall meet regularly to confer about the progress of the parties' activities under this Agreement. The parties shall endeavor to meet no less frequently than once a month.

8.2    Certain Performance Milestones; Term.

(a)    By notice to the Developer, and in accordance with the times and procedures set forth in Section 9.2 hereunder, the City may terminate this Agreement, if, for any reason except Unavoidable Delay (as defined hereinafter):

(i)    on or before thirty (30) days after the execution of this Agreement, the Developer does not submit an Application or Petition for Rezoning of the Project Area, and any other areas agreed upon by the parties, together with a Full Environmental Assessment Form Part I for the Project, and a preliminary Draft Scoping Document under SEQRA for the Project;

(ii)    within one hundred and eighty (180) days after adoption of a final Scoping Document by the SEQRA Lead Agency, the Developer has failed to  submit to the designated lead agency under SEQRA a preliminary Draft Environmental Impact Statement ("DEIS") or Draft Generic Environmental Impact Statement ("DGEIS"), as the case may be, covering the Project; or

(iii)    the Developer refuses to commence negotiating a LADA upon the completion of the public hearing on the DEIS or DGEIS.

If Developer and the City have not executed a LADA for the City Property and Non-City Property on or before the later of (a) the second (2nd) anniversary of the execution of this Agreement or (b) the thirtieth (30th) day following the completion of all SEQRA and any other governmental environmental review procedures applicable to the Project, at the request of

23

**Final Execution Copy**
**June 20, 2007 (11:15 am)**

either party   the terms of the LADA shall be submitted to binding arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association, provided, that the parties first engage in mediation to resolve any dispute.

It is expressly agreed by the parties that under no circumstances may this Agreement be terminated as a result of a Developer failure to comply with the time periods for performance set forth above in this Section 8.2, unless and until Developer has received a notice of default pursuant to Section 9.2 and Developer has failed to cure such default within the time frame allowed under Section 9.2.

(b)      In order to facilitate implementation of the Project hereunder, including Developer meeting the time periods set forth above, the parties agree that they shall take all reasonable actions to expeditiously facilitate and review  Developer's land use applications, including without limitation, all rezoning applications, the relevant SEQRA review and all site plan approval applications.   Such expeditious review shall include the conduct of special meetings as reasonably requested, as well as require any City or Developer consultant to prepare, review and/or respond to, as the case may be,  the relevant submission in an expeditious and good faith manner.  Nothing herein however, requires the City or Developer to conduct any review or take any action prior to a minimum time period prescribed by statute.

(c)      In the event of termination of this Agreement under this Article VIII, the Developer shall, subject to the parties rights and obligations under Articles IX or X hereunder, promptly reimburse any funds owed to the City, including, but not limited to, costs incurred in any condemnation proceeding, and the Developer shall not have any claim of right to any monies that have been paid to the City under Article X below,  except with respect to such amount of said monies as exceeds the total amount needed by the City, to enable it to pay sums owing to third parties for services described  in said Article X.

**ARTICLE IX**

**DEFAULT**

9.1      Default by City.

(a)      If the City fails to comply with any material provision of this Agreement (including without limitation failure to comply with any of its payment, reimbursement or other monetary obligations hereunder), or is otherwise in breach of this Agreement, and such failure continues for more than thirty (30) days after written notice from the Developer is given to the City that specifies the failure and requires it to be remedied, such failure shall constitute an event of default (a City Default"); provided, however, that if any such default is not reasonably capable of cure within thirty (30) days, then provided the City promptly commences to cure and diligently prosecutes the same, such cure period shall be extended for such reasonable period of time as necessary to complete said cure.

Final Execution Copy
June 20, 2007 (11:15 am)

(b)    In the event of a City Default, the Developer, in its discretion, may:

(i)    waive strict compliance with the pertinent provisions of this Agreement and provide the City with an additional time period within which to rectify, or "cure" the City Default;

(ii)    terminate this Agreement, and upon such termination, the City shall be liable for and shall promptly reimburse to the Developer all costs and expenses paid by the Developer to its outside consultants (including legal counsel) in connection with the Project, including costs incurred pursuant to the Exclusivity and Planning Agreement, this Agreement and SEQRA review of the Conceptual Plan and the proposed Project, and upon such reimbursement, the City shall own the plans and specifications prepared by the Developer, provided, that the amount payable by the City under this subparagraph (ii) shall not exceed $500,000.00 in the aggregate; and

(iii)    in addition to any other rights and remedies available at law or in equity, be entitled to seek equitable relief including, but not limited to, specific performance, with respect to the City Default, provided, however, that no municipal entity shall be required to condemn any property, and further provided that the City shall not be liable for any consequential damages (except for the amounts set forth in subparagraph (ii) above).

(c)    In the event Developer brings an action for damages (under clause (b)(ii) above), or specific performance (under clause (b)(iii) above), the prevailing party in such proceeding shall be required to reimburse the non-prevailing party for all costs of enforcement, including all legal fees incurred by the prevailing party in pursuing or defending said specific performance claim, as the case may be, in addition to any costs otherwise payable under this Agreement.

9.2    Default by Developer.

(a)    If the Developer fails to comply with any material provision of this Agreement (including without limitation failure to comply with any of its payment, reimbursement or other monetary obligations hereunder), or is otherwise in material breach of this Agreement, and such failure continues for more than thirty (30) days after written notice from the City is given to the Developer that specifies the failure and requires it to be remedied, such failure shall constitute an event of default (a "Developer Default"); provided, however, that if any such default is not reasonably capable of cure within thirty (30) days, then provided the Developer promptly commences to cure and diligently prosecutes the same, such cure period shall be extended for such reasonable period of time necessary to cure such default. Failure to meet one or more of the dates set forth in Section 8.2(a) shall constitute a material breach. If not cured within the time frames set forth herein after the giving of written notice, such failure shall constitute a Developer Default.

(b)    In the event of a Developer Default, the City, may:

25

Final Execution Copy
June 20, 2007 (11:15 am)

(i)    waive strict compliance with the pertinent provisions of this Agreement and provide the Developer with an additional time period to rectify, or "cure" the Developer Default; or

(ii)    terminate this Agreement, and upon such termination, the Developer shall, subject to the rights and obligations of the parties under Article X hereunder, promptly reimburse to the City any funds owed to each municipal entity with respect to the Project, including, but not limited to, costs incurred in any condemnation proceeding, and the Developer shall not have any claim of right to any monies that have been paid to the City under Article X below,  except with respect to such portion of said monies which exceed the total amount needed by the City, as the case may be, to enable such municipal entity to pay sums owing to third parties for services described in said Article X;  and

(iii)    due to the fact that there would not be an adequate remedy at law, in addition to any other rights and remedies available at law or in equity, be entitled to seek equitable relief including, but not limited to, specific performance, with respect to the Developer Default; provided, however, that the Developer shall not in any case be liable for money damages or consequential damages, or be required to purchase or acquire property, or to expend money to obtain insurable title.

9.3    Effect of LADA.  Notwithstanding the foregoing and any provision in this Agreement to the contrary, once a LADA is executed with respect to the Project Area, then this Agreement shall cease to be operative with respect to such Project Area (all of the rights and obligations of the parties with respect to such Project Area under this Agreement having been superseded by such LADA), and any subsequent termination of this Agreement shall not in any way whatsoever affect or impair the rights and obligations of the parties to such executed LADA.

## ARTICLE X

## CONSULTANT EXPENSES; CERTAIN APPLICATION COSTS

10.1    Developer's In-house Services.  The Developer shall at its own expense supply its own services and expertise.

10.2    Reimbursable Municipal Expenses.    In addition to other costs to be paid as described in this Agreement, and fees legally required to be paid to the City as part of the zoning and building permit process, the Developer shall be liable for and shall reimburse the City for all of the reasonable costs and expenses paid by the City to its  consultants' for reviewing the Project under SEQRA (subject to SEQRA's statutory fee limitation), and for all other reasonable consultant expense incurred by the City in furtherance of the Project (including, but not limited to, defending any lawsuits, environmental consultant costs, and the review and analysis of Developer's financial information) (the "Reimbursable Municipal Expenses"), subject to the

**Final Execution Copy**
**June 20, 2007 (11:15 am)**

periodic review and approval of the consultant expenses in accordance with the Escrow Agreement attached hereto as Schedule C. Subject to Developer's right to dispute bills and invoices presented to it hereunder, the City shall pay Reimbursable Municipal Expenses in accordance with the terms and conditions of the Escrow Agreement, (subject to Developer's obligation to replenish said Escrow as set forth therein). Upon the execution of this Agreement and the Escrow Agreement (attached hereto as Schedule C) by all parties hereto, the Developer shall deposit with the City an advance in the amount of Fifty Thousand ($50,000.00) Dollars, which funds shall be held in a separate account maintained by the City (the "Escrow Account"), and applied solely to the payment of Reimbursable Municipal Expenses. When the Escrow Account is reduced below $25,000.00, the Developer shall deposit an additional sum of money so as to maintain the Account at or near $50,000.00. In the event of a dispute concerning Reimbursable Municipal Expenses the parties shall promptly confer in a good faith effort to resolve the dispute, provided, that such dispute shall not be cause for non-performance by any party of any of its obligations hereunder.

10.3    Developer's Application Fees. Subject to its review of the financial information to be provided to the City by the Developer under paragraph 2.5(f), the City agrees to consider, and negotiate with the Developer in good faith, a reduction of the application and permit fees payable to the City in connection with the Project.

## ARTICLE XI

## DEVELOPER'S EXCLUSIVE RIGHTS

11.1    Developer. During the term of this Agreement, the City shall not: (a) designate any person, firm or entity, other than the Developer, as a qualified and eligible sponsor or preferred Developer for the redevelopment of all or any part of the Project Area; or (b) enter into any agreement with any other firm, person or other entity with respect to the redevelopment of all or any part of the Project Area, excepting however, agreements pertaining to zoning and land use actions and related building permits and customary City actions and providing financial assistance for projects proposed by property owners or their designees (provided that such projects comply with any applicable urban renewal plan then in effect); (c) authorize or direct, by written resolution or other formal act voted on by the City, any representative to act on their behalf in connection with any such agreement; (d) offer or agree to use powers of eminent domain to acquire real property in furtherance of any development proposed by any other firm, person or other entity, or (e) enter into any negotiation or discussions (or solicit or accept any offers) with respect to or related to any of the foregoing. The Developer acknowledges that there are projects being planned or that may arise after the date hereof on which the City will need to take normal and customary action in order to provide City services or financial assistance. Said actions shall not constitute a default hereunder by the City, and in all events the City must comply with all laws, rules and regulations and provide services and assistance consistent with their charters.

27

**Final Execution Copy**
**June 20, 2007 (11:15 am)**

## ARTICLE XII

## MISCELLANEOUS

      12.1    Survival. The following provisions of this Agreement shall survive a termination of this Agreement pursuant to Section 9.1: Sections 9.1, 12.9, 12.15 and 12.19. The following provisions of this Agreement shall survive a termination of this Agreement pursuant to Section 9.2: Sections 3.2(c), 3.4, 9.2, 10.2, 12.9, 12.15 and 12.19. No such survival shall continue beyond the date that a LADA is entered into, except to the extent provided to the contrary in the LADA.

      12.2    Negotiated Document. The parties acknowledge that the provisions and language of this Agreement have been negotiated, and agree that no provision of this Agreement shall be construed against any party by reason of such party having drafted such provision of this Agreement.

      12.3    [Intentionally omitted]

      12.4    Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of New York without regard to conflict of laws principles.

      12.5    Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which together shall constitute one and the same instrument, and any of the parties or signatories hereto may execute this Agreement by signing any such counterpart.

      12.6    Captions. The captions of this Agreement are for the purpose of convenience of reference only, and in no way define, limit or describe the scope or intent of this Agreement or in any way affect this Agreement.

      12.7    Gender, Etc. As used in this Agreement, the masculine shall include the feminine and neuter, the singular shall include the plural, and the plural shall include the singular as the context may require.

      12.8    No Third Party Beneficiaries. Except as may be expressly provided to the contrary in this Agreement, nothing contained in this Agreement shall or shall not be construed to confer upon any person other than the parties hereto, any rights, remedies, privileges, benefits or causes of action to any extent whatsoever.

      12.9    Successors and Assigns. The agreements, terms, covenants and conditions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and, except as otherwise provided herein, their respective successors and permitted assigns.

**Final Execution Copy**
**June 20, 2007 (11:15 am)**

12.10   Further Assurances.   Each party hereto shall do all acts and things and make, execute and deliver such written instruments as shall from time to time be reasonably required to carry out the terms and provisions of this Agreement.

12.11   No Amendment.   Neither this Agreement nor any provisions hereof may be changed, modified, amended, supplemented, altered, waived, discharged or terminated orally, but only by an instrument in writing signed by the party against who enforcement of the change, modification, amendment, supplement, alteration, waiver, discharge or termination is sought, and, if required by any mortgage document, the applicable lender has consented thereto.

12.12   Unavoidable Delay.   Notwithstanding any provision of this Agreement, the performance by the City and Developer of their respective obligations under this Agreement and under the LADA, and all time periods for the performance of all such obligations, shall be subject to Unavoidable Delay, and shall be tolled day for day during a period of Unavoidable Delay.   For the purposes of this Agreement, Unavoidable Delay means any delay, obstruction or interference resulting from any act or event which has a material adverse effect on a party's rights or duties, provided such act or event is beyond the reasonable control of such party after pursuing all diligent efforts to remedy the delaying condition in an expedient and efficient manner and was not separately or concurrently caused by any negligent or willful act or omission of such party and/or could not have been prevented by reasonable actions on such party's part, including, but not limited to, delay, obstruction, or interference resulting from:

(a)   an act of God, landslide, lightning, earthquake, fire, explosion, flood, sabotage or similar occurrence, acts of a public enemy, war, blockage or insurrection, riot or civil disturbance;

(b)   any legal proceeding commenced by any third party seeking judicial review of this Agreement and/or of any governmental approvals for any proposed Project or Infrastructure required therefor, and any restraint of law (e.g., injunctions, court or administrative orders, or legal moratorium imposed by a court, or administrative or governmental authority);

(c)   the failure of any utility or municipal entity to provide and maintain utilities, services, water and sewer lines and power transmission lines to the Project Area or Contiguous Area, which are required for the construction, as contemplated in this Agreement;

(d)   any unexpected or unforeseen subsurface condition at the construction site inconsistent with typical background conditions of a similar site, which shall prevent construction of, or require a material redesign or change in the construction of (or materially adversely affect the completion schedule for) the Project or of Infrastructure, such determination to be made by a qualified engineer;

(e)   strikes, work stoppages or other substantial labor disputes;

(f)   the failure or inability of any subcontractor or supplier to furnish supplies

29

or services if such failure or inability is itself caused by Unavoidable Delay and could not have been reasonably prevented and the affected party cannot reasonably obtain substitutes therefore;

(g)    Governmental delay in completion of environmental review procedures, where such delay is not the result of negligent or willful acts or omissions of the party claiming Unavoidable Delay;

(h)    Developer Default with respect to Unavoidable Delay claimed by the City, and City Default with respect to Unavoidable Delay claimed by the Developer, whether or not the same is caused by negligent or willful acts or omissions; and

(i)    Governmental delay on the part of Federal, State (including without limitation MTA) or County governmental entities, with respect to the granting of permits, approvals or determinations, or with respect to the transfer of property or rights therein, or in completion of Infrastructure or environmental remediation, where such delay is not the result of negligent or willful acts or omissions of the party claiming Unavoidable Delay.

12.13. Inconsistent Provisions.  In the event of inconsistent provisions, the terms and provisions of this Agreement shall prevail over and hereby supersede the Exclusivity and Planning Agreement.

12.14  Entire Agreement.  This Agreement, together with the Schedules hereto, contain all of the promises, agreements, conditions, inducements and understandings between and amongst the parties hereto concerning the proposed Project and there are no promises, agreements, conditions, inducements or understandings, oral or written, expressed or implied, between them other than as expressly set forth herein and therein.

12.15  No Recourse.    All covenants, stipulations, promises, agreements and obligations of the Developer and the City contained in this Agreement shall be deemed to be the covenants, stipulations, promises, agreements and obligations of the Developer and the City respectively, and not of any officer, partner, member, shareholder, agent, servant or employee of the Developer or of the City in any capacity, and no recourse under or upon any obligation, covenant or agreement contained in this Agreement, or otherwise based or in respect thereof, shall be had against any past, present or future officer, partner, member, shareholder, agent, servant or employee of the Developer or of the City or any member of the Developer, either directly or through the Developer or any successor thereto or any person executing this Agreement. It is expressly understood that this Agreement is an obligation of the Developer and of the City and that no personal liability whatever shall attach to, or is or shall be incurred by, any such officer, partner, member, shareholder, agent, servant or employee of the Developer or of the City or any member of the Developer, either directly or through the Developer or any successor thereto or any person executing this Agreement.  Any and all such personal liability of, and any and all such rights and claims against, every such officer, partner, member, shareholder, agent, servant or employee of the Developer or of the City under or by reason of the obligations, covenants, or agreements contained in this Agreement or implied therefrom are, to the extent

30

**Final Execution Copy**
**June 20, 2007 (11:15 am)**

permitted by law, expressly waived and released as a condition of, and as a consideration for, the execution of this Agreement.

      12.16  <u>Public Announcements.</u>  Each of the parties agrees not to make or issue or cause to be made or issued any public announcement, press release, media release or other publicity concerning this Agreement, the parties hereto, the Conceptual Plan or any planning, land acquisition, land disposition, financing, relocation or other concepts addressed in this Agreement, without the prior consent of each of said parties.

      12.17  <u>Notice.</u>  Any notice, demand, request or other communication which under the terms of this Agreement must or may be given or made or served by any of the parties hereto shall be in writing and shall be given or made by mailing the same by registered or certified mail, express courier, or by hand delivery, addressed as set forth below:

<u>If to the City:</u>           City of Newburgh
                         City Hall – 83 Broadway
                         Newburgh, New York 12550
                         Attention: Jean-Ann McGrane, City Manager

with a copy to:      City of Newburgh
                         City Hall – 83 Broadway
                         Newburgh, New York 12550
                         Attention: Geoffrey Chanin, Esq., Corporation Counsel

                         Zarin & Steinmetz
                         81 Main Street, Suite 415
                         White Plains, New York 10601
                         Attention: Michael Zarin, Esq.

<u>If to the Developer:</u>  Howard Kaufman, Esq.
                         Executive Vice-President and General Counsel
                         LeylandAlliance LLC
                         16 Sterling Lake Road
                         Tuxedo, New York  10987

With a copy to:     Larry Wolinsky, Esq.
                         Jacobwitz & Gubits, LLP
                         Counsel to Leyland Alliance LLC
                         158 Orange Avenue
                         Walden, New York  12586

Any of the parties hereto or their counsel may designate by notice in writing a new or other address to which such notice or demand shall thereafter be given, made or mailed.

31

Final Execution Copy
June 20, 2007 (11:15 am)

12.18    <u>No Assignment or Transfer</u>.  Developer may not assign this Agreement or the LADA without the consent of the City, such consent not to be unreasonably withheld or delayed, provided, it is expressly understood that the Developer herein was selected specifically for, among other reasons, its successful track record in similar projects, its creativity and comprehensive view of the Project, willingness to expend the necessary resources to advance the Project, including, the Charrette, the nature and personality of its principals, and other tangible and intangible factors that would be relevant in the City's determination with respect to consenting to any assignment of this Agreement.  No consent shall be required with respect to any assignment to an Affiliate or Successor (as each is hereinafter defined) of Developer.  An "Affiliate" as used herein shall include any entity in which the principals of Developer directly or indirectly own not less than a 25% interest, and in which the principals of the Developer retain daily management and control of the Project.  A "Successor" shall include any entity that acquires all or substantially all of the business of Developer.  Notwithstanding the foregoing or any provision of this Agreement, the Developer may from time to time before and after closing of title on any Project Parcel, assign and/or pledge its interests under this Agreement, the LADA and/or in and to the Project, and the membership interests in Developer, solely as collateral or security, to one or more equity participants and/or lenders in connection with equity financing, "mezzanine" financing or other financing for the construction of the Project.

12.19.    <u>Confidential Information</u>.    During the course of this Agreement, the parties may acquire knowledge or come into possession of confidential, sensitive or proprietary information belonging to the other party in connection with the Project.  The parties agree that they will keep and maintain such information securely and confidentially, and not disclose such information to any third parties, including, the media, nor use such information in any manner publicly or privately, without receiving the prior approval, in writing, of the other party authorizing such use.    The parties agree to be responsible for compliance herein by their subsidiaries, affiliates, employees, representatives, advisors and/or agents.    Nothing herein contained shall be deemed to prohibit parties from complying with any rules, regulations, statutes, or order of any court or regulatory authority with competent jurisdiction. This provision does not apply to information, which (i) is or becomes generally available to the public other than as a result of unauthorized disclosure by one of the parties, or (ii) was available to the other party on a non-confidential basis from a source other than a party herein. The parties' obligations under this clause to maintain the confidentiality of such information and to refrain from using such information in any manner without the prior written approval of the other party shall survive the termination or expiration of this Agreement.  Concurrently herewith, the parties are entering into a separate Confidentiality Agreement related hereto.

or indirectly own not less than a 25% interest, and in which the principals of the Developer retain daily management and control of the Project. A "Successor" shall include any entity that acquires all or substantially all of the business of Developer. Notwithstanding the foregoing or any provision of this Agreement, the Developer may from time to time before and after closing of title on any Project Parcel, assign and/or pledge its interests under this Agreement, the LADA and/or in and to the Project, and the membership interests in Developer, solely as collateral or security, to one or more equity participants and/or lenders in connection with equity financing, "mezzanine" financing or other financing for the construction of the Project.

12.19. <u>Confidential Information</u>.    During the course of this Agreement, the parties may acquire knowledge or come into possession of confidential, sensitive or proprietary information belonging to the other party in connection with the Project. The parties agree that they will keep and maintain such information securely and confidentially, and not disclose such information to any third parties, including, the media, nor use such information in any manner publicly or privately, without receiving the prior approval, in writing, of the other party authorizing such use. The parties agree to be responsible for compliance herein by their subsidiaries, affiliates, employees, representatives, advisors and/or agents. Nothing herein contained shall be deemed to prohibit parties from complying with any rules, regulations, statutes, or order of any court or regulatory authority with competent jurisdiction. This provision does not apply to information, which (i) is or becomes generally available to the public other than as a result of unauthorized disclosure by one of the parties, or (ii) was available to the other party on a non-confidential basis from a source other than a party herein. The parties' obligations under this clause to maintain the confidentiality of such information and to refrain from using such information in any manner without the prior written approval of the other party shall survive the termination or expiration of this Agreement. Concurrently herewith, the parties are entering into a separate Confidentiality Agreement related hereto.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first written above.

CITY OF NEWBURGH

By
Jean-Ann McGrane, City Manager

31

Dated: _____ 7/24/07

LEYLAND ALLIANCE LLC

By: _____
Steve J. Maun, President

Dated: __8/14/2007__

32

APPENDIX D

DRAFT – SUBJECT TO FURTHER REVIEW

## ENVIRONMENTAL EASEMENT

THIS INDENTURE made this ____day of _____, 200__, between __[Owners(s)] residing at (or having an office at ) _____, (the "Grantor"), and The People of the State of New York (the "Grantee"), acting through their Commissioner of the Department of Environmental Conservation (the "Commissioner", or "NYSDEC" or "Department" as the context requires) with its headquarters located at 625 Broadway, Albany, New York 12233,

**WHEREAS**, the Legislature of the State of New York has declared that it is in the public interest to encourage the remediation of abandoned and likely contaminated properties (including brownfield sites) that threaten the health and vitality of the communities they burden while at the same time ensuring the protection of public health and the environment; and

**WHEREAS**, the Legislature of the State of New York has declared that it is in the public interest to establish within the Department a statutory environmental remediation program that includes the use of environmental easements as an enforceable means of ensuring the performance of operation, maintenance, and/or monitoring requirements and of ensuring the potential restriction of future uses of the land, when an environmental remediation project leaves residual contamination at levels that have been determined to be safe for a specific use, but not all uses, or which includes engineered structures that must be maintained or protected against damage to perform properly and be effective, or which requires groundwater use or soil management restrictions; and

**WHEREAS**, the Legislature of the State of New York has declared that environmental easement shall mean an interest in real property, created under and subject to the provisions of Article 71, Title 36 of the New York State Environmental Conservation Law ("ECL") which contains a use restriction and/or a prohibition on the use of land in a manner inconsistent with engineering controls which are intended to ensure the long term effectiveness of a site remedial program, such as state brownfield sites or federal National Priorities List sites, or eliminate potential exposure pathways to hazardous substances, hazardous waste or petroleum; and;

**WHEREAS**, Grantor is the owner of real property located in the City/Town/Village of _____, County, New York known and designated on the tax map of the _____ of _____ as tax map parcel number_____, section ___block ___lot____ , being the same as that property conveyed to Grantor by deed on _____, and recorded in the Land Records of the County Clerk at Page ____, Liber _____ of Deeds, comprised of approximately ____ acres, and hereinafter more fully described in Schedule A attached hereto and made a part hereof ( the "Controlled Property"); and;

*Attach an adequate legal description of the property subject to the easement, or reference a recorded map. If the easement is on only a part of a parcel of land which is not subdivided into encumbered and unencumbered portions, a legal description needs*

DRAFT – SUBJECT TO FURTHER REVIEW

*to be created by a survey bearing the seal and signature of a licensed land surveyor with reference to a metes and bounds description.*

**WHEREAS**, the Controlled Property is part of the Superfund Site ("Site"), which the U.S. Environmental Protection Agency ("EPA"), pursuant to Section 105 of the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9605, placed on the National Priorities List, as set forth in Appendix B of the National Oil and Hazardous Substances Pollution Contingency Plan ("NCP"), 40 C.F.R. Part 300, by publication in the Federal Register on June 14, 2001; and

**WHEREAS**, in a Record of Decision dated October 4, 2006 (the "ROD"), the Regional Administrator of EPA Region 2 selected, and NYSDEC concurred with, a "response action" for the Site, which provides, in pertinent part, for the following actions:

1.    excavation of contaminated soil exceeding the residential cleanup standard for lead of 400 parts per million to a depth of 6 feet below ground surface across the 7-acre Site and off-Site disposal;

2.    excavation to the water table and off-Site disposal of soils, if any, which exceed the State cleanup criteria for volatile organic compounds and polychlorinated biphenyls;

3.    placement of a readily-visible demarcation material at the interface between the excavations and backfill;

4.    institutional controls in the form of an environmental easement and/or restrictive covenant that will at a minimum require:

        (a) restricting any excavation below the soil cover's demarcation layer of six feet unless the excavation activities are in compliance with an EPA-approved Site Management Plan ("SMP"),
        (b) restricting new construction at the Site unless an evaluation of the potential for vapor intrusion is conducted an mitigation, if necessary, is performed in accordance with an EPA-approved SMP, and
        (c) restricting the use of groundwater as a source of potable or process water unless groundwater quality standards are met;

**WHEREAS**, the Commissioner does hereby acknowledge that the Department accepts this Environmental Easement in order to ensure the protection of human health and the environment and to achieve the requirements for remediation established at this Controlled Property until such time as this Environmental Easement is extinguished pursuant to ECL Article 71, Title 36; and

**NOW THEREFORE**, in consideration of the covenants and mutual promises contained herein and the terms and conditions of **Consent Decree Number _____**, Grantor grants, conveys and releases to Grantee a permanent Environmental Easement pursuant to

2

DRAFT – SUBJECT TO FURTHER REVIEW

Article 71, Title 36 of the ECL in, on, over, under, and upon the Controlled Property as more fully described herein ("Environmental Easement").

1.    <u>Purposes</u>.  Grantor and Grantee acknowledge that the Purposes of this Environmental Easement are: to convey to Grantee real property rights and interests that will run with the land in perpetuity in order to provide an effective and enforceable means of encouraging the reuse and redevelopment of this Controlled Property at a level that has been determined to be safe for a specific use while ensuring the performance of operation, maintenance, and/or monitoring requirements; and to ensure the potential restriction of future uses of the land that are inconsistent with the above-stated purpose.

2.    <u>Institutional and Engineering Controls</u>.  The following controls apply to the use of the Controlled Property, run with the land are binding on the Grantor and the Grantor's successors and assigns, and are enforceable in law or equity against any owner of the Controlled Property, any lessees, and any person using the Controlled Property:

A.  The Controlled Property may be used for residential, commercial, and/or recreational use subject to the restrictions in 2.B. below and as long as the following long term engineering control is employed:

[Readily visible demarcation material at the interface between the excavations and backfill (approximately 6 feet below ground surface)]

B.  The Controlled Property may not be used for a higher level of use than identified in 2.A. above and the above-stated engineering control may not be discontinued without an amendment or extinguishment of this Environmental Easement. The Controlled Property is subject to the following restrictions on use:

i.  excavation below the soil cover's demarcation layer of six feet is prohibited unless the excavation activities are in compliance with an EPA approved SMP;

ii.  new construction at the Site is prohibited unless an evaluation of the potential for vapor intrusion is conducted and mitigation, if necessary, is performed in compliance with the EPA-approved SMP; and

iii.  use of groundwater at the Site as a source of potable or process water is prohibited until groundwater quality standards are met at the Site.

C.  Grantor covenants and agrees that until such time as the Environmental Easement is extinguished in accordance with the requirements of Article 71, Title 36 of the ECL, the property deed and all subsequent instruments of conveyance relating to the Controlled Property shall state in at least fifteen-point bold-faced type:

**This property is subject to an environmental easement held by the New York State Department of Environmental Conservation pursuant of Title 36 to**

3

DRAFT – SUBJECT TO FURTHER REVIEW

# Article 71 of the Environmental Conservation Law.

D. Grantor covenants and agrees that this Environmental Easement shall be incorporated in full or by reference in any leases, licenses, or other instruments granting a right to use the Controlled Property.

E. Grantor covenants and agrees that it shall annually, or such time as NYSDEC may allow, submit to NYSDEC a written statement by an expert the NYSDEC may find acceptable certifying under penalty of perjury that the controls employed at the Controlled Property are unchanged from the previous certification or that any changes to the controls employed at the Controlled Property were approved by the NYSDEC, and that nothing has occurred that would impair the ability of such control to protect the public health and environment or constitute a violation or failure to comply with any Site Management Plan for such controls and giving access to such Controlled Property to evaluate continued maintenance of such controls.

3.    <u>Right to Enter and Inspect</u>.  Grantee, its agents, employees, or other representatives of the State may enter and inspect the Controlled Property in a reasonable manner and at reasonable times to assure compliance with the above-stated restrictions. Nothing in this Environmental Easement shall limit or otherwise affect the rights of NYSDEC or EPA to entry and access or EPA's authority to take response action.

4.    <u>Reserved Grantor's Rights</u>.  Grantor reserves for itself, its assigns, representatives, and successors in interest with respect to the Controlled Property, all rights as fee owner of the Controlled Property, including:

A. Use of the Controlled Property for all purposes not inconsistent with, or limited by the terms of this Environmental Easement;

B. The right to give, sell, assign, or otherwise transfer the underlying fee interest to the Controlled Property by operation of law, by deed, or by indenture, subject and subordinate to this Environmental Easement;

5.    <u>Enforcement</u>

A. This Environmental Easement is enforceable in law or equity in perpetuity by Grantor, Grantee, or any affected local government, as defined in ECL Section 71-3603, against the owner of the Property, any lessees, and any person using the land. Enforcement shall not be defeated because of any subsequent adverse possession, laches, estoppel, or waiver. It is not a defense in any action to enforce this environmental easement that: it is not appurtenant to an interest in real property; it is not of a character that has been recognized traditionally at common law; it imposes a negative burden; it imposes affirmative obligations upon the owner of any interest in the burdened property; the benefit does not touch or concern real property; there is no privity of estate or of contract; or it imposes an unreasonable restraint on alienation.

4

DRAFT – SUBJECT TO FURTHER REVIEW

B. If any person intentionally violates this environmental easement, the Grantee may revoke any Certificate of Completion provided under ECL Article 27, Title 14, or the Satisfactory Completion of Project provided under ECL Article 56, Title 5 with respect to the Controlled Property.

C. Grantee shall notify Grantor of a breach or suspected breach of any of the terms of this Environmental Easement. Such notice shall set forth how Grantor can cure such breach or suspected breach and give Grantor a reasonable amount of time from the date of receipt of notice in which to cure. At the expiration of such period of time to cure, or any extensions granted by Grantee, the Grantee shall notify Grantor of any failure to adequately cure the breach or suspected breach. Grantor shall then have a reasonable amount of time from receipt of such notice to cure. At the expiration of said second period, Grantee may commence any proceedings and take any other appropriate action reasonably necessary to remedy any breach of this Environmental Easement in accordance with applicable law to require compliance with the terms of this Environmental Easement.

D. The failure of Grantee to enforce any of the terms contained herein shall not be deemed a waiver of any such term nor bar its enforcement rights in the event of a subsequent breach of or noncompliance with any of the terms of this Environmental easement.

6.    Notice.  Whenever notice to the Grantee (other than the annual certification) or approval from the Grantee is required, the Party providing such notice or seeking such approval shall identify the Controlled Property by referencing its County tax map number or the Liber and Page or computerized system tracking/ identification number and address correspondence to:

Division of Environmental Enforcement
Office of General Counsel
New York State Department of Environmental Conservation
625 Broadway
Albany New York 12233-5500, and

U.S. Environmental Protection Agency, Region 2
Office of Regional Counsel - NY/Caribbean Superfund Branch
290 Broadway, 17th Floor
New York, NY 10007.

Such correspondence shall be delivered by hand, or by registered mail or by Certified mail and return receipt requested.  The Parties may provide for other means of receiving and communicating notices and responses to requests for approval.

7.    Recordation. Grantor shall record this instrument, within thirty (30) days of execution of this instrument by the Commissioner or her/his authorized representative in

DRAFT – SUBJECT TO FURTHER REVIEW

the office of the recording officer for the county or counties where the Controlled Property is situated in the manner prescribed by Article 9 of the Real Property Law.

8.    Amendment.  This Environmental Easement may be amended only by an amendment executed by the Commissioner of the New York State Department of Environmental Conservation, with prior written consent of EPA, and filed with the office of the recording officer for the county or counties where the Property is situated in the manner prescribed by Article 9 of the Real Property Law.

9.    Extinguishment.  This Environmental Easement may be extinguished only by a release by the Commissioner of the New York State Department of Environmental Conservation, with prior written consent of EPA, and filed with the office of the recording officer for the county or counties where the Controlled Property is situated in the manner prescribed by Article 9 of the Real Property Law.

10.    Joint Obligation.  If there are two or more parties identified as Grantor herein, the obligations imposed by this instrument upon them shall be joint and several.

11.    Third-Party Beneficiary.  Grantor and Grantee hereby agree that the United States, through EPA, shall be, on behalf of the public, third-party beneficiaries of the benefits, rights and obligations conveyed to Grantee in this instrument; provided that nothing in this instrument shall be construed to create any obligations on the part of EPA or create any right of access or use by the general public.

**IN WITNESS WHEREOF,** Grantor has caused this instrument to be signed in its name.

**Grantor's Name**

By:_____ _____

Title:_____

Date:_____

**THIS ENVIRONMENTAL EASEMENT IS HEREBY ACCEPTED BY THE PEOPLE OF THE STATE OF NEW YORK,** Acting By and Through the Department of Environmental Conservation

By: _____

Alexander B. Grannis, Commissioner

6

DRAFT – SUBJECT TO FURTHER REVIEW

**Grantor's Acknowledgment**

STATE OF NEW YORK )
                      ) ss:
COUNTY OF        )

      On the _____ day of _____, in the year 200_, before me, the undersigned, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_____
Notary Public - State of New York

**Grantee's Acknowledgment**

STATE OF NEW YORK )
                      ) ss:
COUNTY OF        )

      On the _____ day of _____, in the year 200_, before me, the undersigned, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name is (are) subscribed to the within instrument and acknowledged to me that he/she/ executed the same in his/her/ capacity as Commissioner of the State of New York Department of Environmental Conservation, and that by his/her/ signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public - State of New York
Attachment: Schedule A - Legal Description of Controlled Property

7